## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| MEAGAN GREEN, derivatively on behalf of MALIBU BOATS, INC., | |
| Plaintiff, | Case No.: _____ |
| vs. | |
| JACK D. SPRINGER, DAVID S. BLACK, BRUCE BECKMAN, JAMES R. BUCH, IVAR S. CHHINA, MICHAEL J. CONNOLLY, MICHAEL K. HOOKS, MARK W. LANIGAN, JOAN M. LEWIS, PETER E. MURPHY, JOHN E. STOKELY, NANCY M. TAYLOR, and WAYNE R. WILSON, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| MALIBU BOATS, INC., | |
| Nominal Defendant. | |

## <u>VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

## <u>INTRODUCTION</u>

Plaintiff Meagan Green ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Malibu Boats, Inc. ("MBI" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jack D. Springer ("Springer"), David S. Black ("Black"), Bruce Beckman ("Beckman"), James R. Buch ("Buch"), Ivar S. Chhina ("Chhina"), Michael J. Connolly ("Connolly"), Michael K. Hooks ("Hooks"), Mark W. Lanigan ("Lanigan"), Joan M. Lewis ("Lewis"), Peter E. Murphy ("Murphy"), John E. Stokely ("Stokely"), Nancy M. Taylor ("Taylor"), and Wayne R. Wilson ("Wilson") (collectively, the "Individual Defendants," and together with MBI, "Defendants") for breaches of their fiduciary duties as directors and/or officers of MBI, unjust enrichment, abuse of control, gross mismanagement, waste

of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Springer, Beckman, Black, and Wilson for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding MBI, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.  This is a shareholder derivative action that seeks to remedy wrongdoing committed by MBI's directors and officers from November 4, 2022 to May 2, 2024, inclusive (the "Relevant Period").

2.  MBI is a Tennessee-based company incorporated in the state of Delaware. MBI's principal activity is the design, production, and marketing of recreational powerboats, including but not limited to performance sport boats, sterndrive, and outboard boats. MBI chiefly sells its products under eight brands and held the top U.S. market share position in the performance sport boat category as of June 30, 2024. MBI offers boats to accommodate a variety of water-based activities, including but not limited to water sports, fishing, and boating in general.

3.  MBI's method of business centers around its network of independent dealers, with

the dealers utilizing third-party financing agreements to facilitate purchases. Dealers receive a line of credit from the lender to purchase boats and pay the lender a portion of their sales when a boat is sold to a customer. As such, MBI recognizes a sale and receives payment as soon as a boat is shipped to a dealer. Among MBI's most significant dealers was Tommy's Boats ("Tommy's"). In the fiscal years 2022 and 2023, Tommy's represented 9.4% and 10.7% of MBI's consolidated net sales, respectively. Further, Tommy's represented roughly 23.3% of net sales for the Company's Malibu Segment in the 2023 fiscal year.

4.     Prior to the start of the Relevant Period, MBI experienced significant growth, in large part due to increased demand for boats resulting from the COVID-19 pandemic. Between fiscal years 2020 and 2021, the Company's sales grew 42%, and between fiscal years 2021 and 2022, the Company's sales grew a further 30%. However, the COVID-19 sales boom began to dissipate by mid-2022, with sources within the industry predicting that 2023 demand would be roughly 50% less than it was in 2022.

5.     In anticipation of the predicted demand collapse within its industry, MBI searched for a way to maintain its 2022 sales records. To accomplish this, MBI utilized its significant influence over Tommy's to coerce the dealer into receiving inventory in excess of its needs to artificially inflate MBI's sales figures. At first, MBI began with mounting pressure to accept increasing levels of excess inventory. When Tommy's president Matthew Borisch ("Borisch") resisted, MBI clarified that refusal to accept additional inventory would result in Tommy's forfeiture of its status as a Malibu dealer. Additionally, MBI withheld financial incentives earned by Tommy's during the 2022 fiscal year[1] as further leverage to accept additional inventory

---

[1] MBI's fiscal year begins on July 1 and ends on June 30 (i.e. FY 2023 began on July 1, 2022, and ended on June 30, 2023).

3

(collectively, the "Channel Stuffing Misconduct"). In late 2022, MBI required that Tommy's possess at least twenty-five weeks' worth of Malibu Segment inventory on hand. However, to do so would require a major expansion of Tommy's floor plan capacity, and additional credit from Tommy's lender, Fifth Third Bank. As a result, MBI contacted Tommy's point of contact with its lender and demanded that Tommy's extend its line of credit or face negative consequences. Tommy's thereafter extended its line of credit by 70%, from $50 million to $85 million.

6.      In light of cancelled orders from other dealers, MBI and the Individual Defendants were incentivized to continue engaging in the Channel Stuffing Misconduct, which would eventually land Tommy's in complete financial disarray. Indeed, Defendant Springer was particularly incentivized to engage in the scheme because, under the Company's compensation policy, Defendant Springer was eligible for lucrative cash bonuses equal to or greater than his **entire salary** if MBI met certain specified targets for net income and Adjusted EBITDA. Thus, the Defendants continued their efforts to pump Tommy's full of surplus inventory as a way to ensure MBI would hit the financial projections it had touted to investors. As a result of the foregoing, in early 2023, after Tommy's had reached its credit limit with the first lender, MBI introduced Tommy's to a second lender, M&T Bank. The second lender agreed to provide a total of $130 million in credit to Tommy's. At the same time, MBI took steps to mitigate the financial risks it would undertake as a result of such a high volume injection of inventory into the dealer. Indeed, while MBI usually entered into repurchase agreements for unsold inventory in the event of a dealer's default (whereby the Company would buy back the excess product from the dealer, thus shouldering the repurchase costs itself), such agreements were conspicuously absent here. However, Tommy's was unaware that there was no repurchase agreement in place with MBI. In total, MBI dumped $50 million of excess inventory on Tommy's between May and June 2023

4

alone.

7.      The inventory pumping scheme succeeded in the short-term by allowing MBI to slightly beat its guidance for the 2023 fiscal year. MBI's guidance for the 2023 fiscal year reflected that net sales would grow "slightly over 10%" from the previous year. Through the additional $50 million in excess inventory sales, MBI reported total sales of $1.388 billion for the 2023 fiscal year, just above the 10% projections (approximately $1.34-$1.35 billion). Thus, the inventory pumping scheme allowed MBI to successfully mask its decreasing sales elsewhere.

8.      While engaging in this scheme, the Individual Defendants not only failed to disclose their conduct to investors but continued to insist that the Company's financial prospects were strong. For instance, on November 4, 2022, the first day of the Relevant Period, Defendant Springer noted during an earnings call with investors that the Company's ". . . *continued momentum was supported by ongoing demand strength in both [the] fresh and saltwater businesses*."[2] Likewise, in an earnings call held with investors on February 7, 2023, Defendant Springer stated that "*[t]he retail environment remains resilient with strong demand carrying the tide for [the Company's] premium boats," and that the Company saw ". . . no worsening of [its] expected outlook.*"

9.      Throughout the Relevant Period, the Individual Defendants continued to misrepresent the true nature of supply and demand for the Company's products. Despite the ongoing scheme to offload large quantities of product on Tommy's, the Individual Defendants trumpeted the "normalization" of inventory, in reference to achieving a balance between supply and demand. On May 3, 2023, Defendant Springer noted in a press release that inventory levels

---

[2] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

were reaching normalization and also stated that "*we know how much weeks on-hand of inventory that our dealers should have. [. . .] we know what the right level of inventory on-hand should be. And so that's something that I think that not only us but most marine companies have gotten very good at managing.*"

10.     The Individual Defendants continued to champion the Company's efforts to balance supply and demand for its products, despite carrying on a scheme in which its dealers were saddled with far more product than current consumer demand called for. On August 29, 2023, the Company released a press release in which Defendant Springer stated "*we remain confident in our operational prowess to match wholesale and retail demand[.]*"

11.     The truth began to emerge on January 30, 2024 when the Company issued a press release concerning its financial results for the second quarter of fiscal year 2024. The Company reported an approximately 38% decline in sales, 44% decline in unit volumes, and a 60% adjusted EBITDA decrease year-over-year. Additionally, the Company announced a second reduction in guidance for the 2024 fiscal year. In the press release, Defendant Springer stated: "*[w]e are recalibrating wholesale production to match retail demand, as seasonality along with continued interest rate pressures has resulted in elevated inventory levels.*" Defendant Springer also noted "*channel inventories [were] higher than we, or our dealers would like to see,*" and, specifically, MBI dealers had "*around 5 weeks too much on hand inventory.*"

12.     On this news, the price per share of the Company's common stock fell nearly 20% in one day—or $9.47 per share—on unusually high volume, from a closing price of $51.03 per share on January 29, 2024 to close at $41.56 per share on January 30, 2024.

13.     The truth continued to emerge on April 10, 2024 when Tommy's filed a complaint against the Company for various claims, including breach of obligation under dealership

agreement, promissory estoppel, and intentional and negligent misrepresentations relating to the parties' commercial relationship. Specifically, the complaint alleged that MBI perpetrated "an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value…" Subsequently, the Company filed a Form 8-K with the SEC acknowledging both the termination of its relationship with Tommy's and the lawsuit Tommy's filed against it.

14.     The truth fully emerged on May 2, 2024 when the Company released its financial results for the third quarter of fiscal year 2024. Notably, the Company reported *a 46% drop in new sales from the prior quarter*, and a 70% drop in Adjusted EBITDA. As such, the Company projected that consolidated net sales for the fiscal year of 2024 would be 40% lower than the previous year. Defendant Springer attributed these adjustments to "weakened retail environment characterized by lingering uncertainty and softened retail demand," as well as excess inventory. Defendant Springer stated that the Company needed to "*focus on channel inventory reductions through the remainder of fiscal year '24,*" by reducing boat production *"even further to reach our goals of continuing to optimize the channel inventory,*" and noted that product inventory was still four weeks too high.

15.     On this news, the price per share of the Company's common stock fell $1.27 per share, or nearly 4%, on unusually high trading volume, from a closing price of $33.06 per share on May 1, 2024 to close at $31.79 per share on May 2, 2024.

16.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series

of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that: (1) current wholesale and retail demand for MBI's products were far lower than reported; (2) as a result, an incongruity existed between inventory supply and product demand; (3) the Individual Defendants were engaging in the Channel Stuffing Misconduct; and (4) as a result of the Channel Stuffing Misconduct, major MBI dealers were in serious financial predicaments due to dramatically enlarged inventories. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

17.     The Individual Defendants breached their fiduciary duties by engaging in the Channel Stuffing Misconduct and by failing to correct and/or causing the Company to fail to correct the false and misleading statements and omissions of material fact alleged herein, while, during the Relevant Period, two of the Individual Defendants sold Company shares at inflated prices for total proceeds of approximately $1,525,510. Additionally, during the Relevant Period, the Individual Defendants breached their fiduciary duties to the Company by causing MBI to repurchase its own common stock at prices that were artificially inflated due to the foregoing misrepresentations, causing the Company to overpay for repurchases of its own common stock by approximately $6,025,717.89 in total.

18.     In light of the Individual Defendants' misconduct—which has subjected the Company, its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO") and Secretary, its current Vice President of Finance, and its current CFO to a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of

New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

19.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the Company's, its former CEO's, its former CFO and Secretary's, its current Vice President of Finance's, and its current CFO's liability in the Securities Class Action, of the Individual Defendants' engagement in the Channel Stuffing Misconduct, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) and 20(a) of the Exchange Act (15. U.S.C. § 78j(b), 78t(a) and 78t-1) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

21.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff is a current shareholder of MBI. Plaintiff has continuously held MBI common stock since first purchasing the stock on May 19, 2021.

### Nominal Defendant MBI

26.     MBI is a Delaware corporation with principal executive offices at 5075 Kimberly Way, Loudon, Tennessee 37774. The Company's common stock trades on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "MBUU."

### Defendant Springer

27.     Defendant Springer served as the Company's CEO from February 2010 to May 17, 2024 and as a Company director from February 2014 to May 17, 2024.

28.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Springer made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 06/07/2023 | 25,000 | $59.92 | $1,498,125 |

Thus, in total, before the fraud was exposed, he sold 25,000 shares of Company stock on inside information, for which he received approximately $1,498,125 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

29. The Schedule 14A the Company filed with the SEC on September 15, 2023 (the "2023 Proxy Statement") stated the following about Defendant Springer:

> Mr. Springer was our interim Chief Executive Officer beginning in May 2009 and became our Chief Executive Officer in February 2010. He has been a member of the Board since our IPO in February 2014. Mr. Springer was a director of the LLC from May 2009 until our recapitalization in connection with the IPO in February 2014. From June 2003 to February 2010, Mr. Springer was a partner and managing director with Qorval, LLC, a private consultancy that provides strategic leadership and executive management across various industries. As a result of his role with Qorval, Mr. Springer has served as Chief Executive Officer at Diamondback Tactical LLP, a manufacturer of tactical armor systems for federal, state and local law enforcement agencies and defense contractors, as Chief Restructuring Officer of American Plastics, Inc., a thermoform plastics manufacturer for the restaurant and hospitality industry and as interim Chief Executive Officer of Allen White Inc., a furniture manufacturer and wholesaler. While at Qorval, Mr. Springer was also Chief Integration Officer at Nautic Global Group from 2004 to 2007, during which time he was responsible for the integration of two boat manufacturers. Mr. Springer received a B.A. in Accountancy from the University of Texas of the Permian Basin. Based on his perspective and experience as our Chief Executive Officer, as well as his depth of experience in the boat manufacturing industry and as a chief executive, we believe that Mr. Springer is qualified to serve on the Board.

**Defendant Black**

30. Defendant Black served as interim CFO from April 2023 to November 27, 2023, and currently serves as the Company's Vice President of Finance.

31. During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Black made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 11/08/2023 | 631 | $43.40 | $27,385 |

Thus, in total, before the fraud was exposed, he sold 631 shares of Company stock on inside information, for which he received approximately $27,385 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The 2023 Proxy Statement stated the following about Defendant Black:

From 2017 to November 2020, he was our Director of Internal Audit. Mr. Black has over sixteen years of experience in accounting and finance across both public and private companies. He received a B.A. in Finance from Fairmont State University and is a Certified Public Accountant (CPA) and Certified Internal Auditor (CIA).

**Defendant Beckman**

33.     Defendant Beckman has served as the Company's CFO since November 27, 2023.

34.     The Current Report (Form 8-K) the Company filed with the SEC on November 8, 2023 (the "November 2023 8-K") stated the following about Defendant Beckman:

Mr. Beckman, 55, served as Senior Vice President, Finance at Entegris from February 2018 to November 2023 and as Vice President, Finance from April 2015 to February 2018. From 1990 to 2015, Mr. Beckman worked in numerous capacities for General Mills, Inc., including Vice President, Finance, Meals Division from July 2012 to January 2015, Director of Corporate Planning & Analysis from July 2008 to July 2012 and Director of Internal Controls from 2003 to 2005.

**Defendant Buch**

35.     Defendant Buch has served as a Company director since February 2014 and serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.

36.     The 2023 Proxy Statement stated the following about Defendant Buch:

Mr. Buch became a member of the Board in 2014 in connection with the IPO. Now retired, he held the position of chief executive officer of UMA Enterprises, Inc., which is a private company and one of the largest distributors of home décor

products in North America, from May 2017 through September 2019. From 2012 to 2016, he served as president and chief executive officer of Lynx Grills, a manufacturer of grills and outdoor kitchen products for residential consumers. In 2011 and 2012, Mr. Buch was interim president and chief executive officer of Sunbrite TV, a manufacturer of high-definition televisions, and he was a consultant and operating advisor to various private equity and investment firms from 2008 to 2010, assisting businesses on multiple fronts, including growth strategies, restructuring and business model assessment. Mr. Buch has also served and continues to serve on board and advisory councils for a number of private and nonprofit organizations. He received a bachelor's degree and an M.B.A. from California State University-Fullerton. Based on his extensive leadership and advisory experience with manufacturers of consumer products, we believe Mr. Buch is qualified to serve on the Board.

**Defendant Chhina**

37.     Defendant Chhina has served as a Company director since February 2014 and serves as the Chair of the Audit Committee and as a member of the Nominating and Governance Committee.

38.     The 2023 Proxy Statement stated the following about Defendant Chhina:

Mr. Chhina became a member of the Board in 2014 in connection with the IPO. Now retired, from 2009 to 2011, he served as the chief financial officer and executive vice president for Recreational Equipment, Inc. (REI), a national retailer of outdoor recreational equipment and apparel, and previously served on REI's board from 2006 to 2009, where he was chair of its audit and finance committee as well as board vice chair. From 2001 to 2007, Mr. Chhina was chairman and chief executive officer, and previously chief operating officer and chief restructuring officer of Interdent, Inc., a health care management services company. From 1991 to 2001, Mr. Chhina held senior executive, finance and operational roles with several portfolio companies of Mehta & Company, a private equity firm for which he was an operating partner and is currently a venture partner. Mr. Chhina also currently serves on the boards of directors of Sage Dental Management LLC (audit committee chair), Walker Edison Holdco LLC (independent director, audit committee chair) and Lone Peak Holdings LLC (audit committee chair), and as a board observer for Evology LLC (dba Aptive Environmental), all of which are private companies; and as an independent board director and audit committee chair for Agribank, FCB, a wholesale bank for the U.S. Farm Credit System. Previously, he held executive positions and/or board directorships with several companies, including as interim chief executive officer, and later as a director/advisor to the managing member of JDC Management LLC, on the board of directors of PPV Holding Company LLC, Troy Lee Designs Inc., Stat Health Holding LLC, DDP DMO Superholdings LLC, and Dimensional Dental Management LLC. He has also served on and chaired boards and committees of charitable and educational entities,

including as a board director and member of the audit and finance committee of the Pacific Science Center, as a director and chair of the finance committee of the Washington chapter of The Nature Conservancy, and as a director, board chair and finance chair of Fort Mason Center. Mr. Chhina received an M.A. in international policy studies from the Middlebury College Monterey Institute and a dual B.A. in economics and political science from the University of Nevada Reno. We believe Mr. Chhina is qualified to serve on the Board based on his financial expertise, knowledge of the recreational products industry and extensive experience advising, operating and directing businesses across multiple industries.

**Defendant Connolly**

39.     Defendant Connolly has served as a Company director since February 2014 and serves as the Chair of the Nominating and Governance Committee and as a member of the Compensation Committee.

40.     The 2023 Proxy Statement stated the following about Defendant Connolly:

Mr. Connolly became a member of the Board in 2014 in connection with the IPO. He has been the chief executive officer of Fourth Street Capital, Inc., which manages a portfolio of retail, flex-industrial, warehouse and multifamily real estate holdings, since October 2021. He has been a founding partner of Breakaway Capital Management, LLC, a private investment fund manager which provided debt and structured equity capital to lower middle market companies, since 2015. In addition, Mr. Connolly is chief executive officer and sole director of Motorini, Inc., which operates a motorcycle dealership and service provider. From 2007 to 2013, he was a partner with Leonard Green & Partners, LP., a private equity firm. Previously, Mr. Connolly was an investment banker at UBS Securities, LLC, where he served as managing director and co-head of UBS's Los Angeles investment banking office, and a senior vice president at Donaldson, Lufkin & Jenrette. From 2010 through May 2017, he was on the board of Cascade Bancorp (Nasdaq: CACB), where he was the chairman of the board loan committee and member of the compensation and audit committees. From 2011 through 2016, he was on the board of FP Holdings, LP, a private company and the parent company of the Palms Casino Resort. He is a member of the emeritus board of the Los Angeles Regional Food Bank. He received a bachelor's degree from the University of California-Berkeley. Based on his extensive experience as an investment banker advising companies on their strategic alternatives and his experience as a private equity manager working with companies and their management teams to grow and improve their businesses, we believe Mr. Connolly is qualified to serve on the Board.

**Defendant Hooks**

14

41.     Defendant Hooks has served as a Company director since February 2014 and also serves as Chairman of the Board and as a member of the Nominating and Governance Committee.

42.     The 2023 Proxy Statement stated the following about Defendant Hooks:

Mr. Hooks has been a member of the Board since our IPO in February 2014. Mr. Hooks was a director of the LLC from May 2009 until our recapitalization in connection with the IPO in February 2014. He is a co-founder and has been managing partner of Westhook Capital LLC since 2017, and he is a co-founder and has been a managing director of Black Canyon Capital LLC since 2004. Previously, Mr. Hooks was a co-head of the Los Angeles office of Credit Suisse First Boston and a managing director in the Los Angeles office of Donaldson, Lufkin & Jenrette. He previously served on the boards of directors of JDC Healthcare Management, Saunders & Associates, TASI Holdings, Virgin America, Logan's Roadhouse and Switchcraft, as well as the Supervisory Board of Pfeiffer Vacuum Technology, at the time a public company listed on the New York Stock Exchange. Mr. Hooks received a degree in Economics from Princeton University and an M.B.A. with distinction from the Wharton School of Business. Based on his extensive experience as an investment banker advising companies on their financing and strategic alternatives, his experience as a private equity manager working with companies and their management teams to grow and improve their businesses, and his deep knowledge of the Company given his initial tenure as a board member of the LLC, we believe Mr. Hooks is qualified to serve on the Board.

**<u>Defendant Lanigan</u>**

43.     Defendant Lanigan has served as a Company director since February 2014 and serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee.

44.     The 2023 Proxy Statement stated the following about Defendant Lanigan:

Mr. Lanigan has been a member of the Board since our IPO in February 2014. Mr. Lanigan was a director of the LLC from May 2009 until our recapitalization in connection with the IPO in February 2014. He was a co-founder and has been a managing director of Black Canyon Capital LLC since 2004. Mr. Lanigan has also been a consultant with Tailwind Capital, a private equity firm, since 2015. Mr. Lanigan was formerly a co-head of the Los Angeles office and a member of the Investment Banking Executive Board of Credit Suisse First Boston and head of the Los Angeles office of Donaldson, Lufkin & Jenrette. He also serves on the boards of directors of LRW Holdings, LLC and Lone Peak Holdings, LLC, which are both private companies, and he previously served on the boards of directors of Benevis Holdings, LLC, JDC Healthcare Management, Virgin America, Archway Marketing Services, TASI Holdings, Inc. and Saunders & Associates. Mr. Lanigan

15

graduated summa cum laude, Phi Beta Kappa with a degree in Economics from Colgate University and received a J.D. degree from Harvard Law School and an M.B.A. from Harvard Business School. We believe Mr. Lanigan is qualified to serve on the Board based on his extensive experience as an investment banker advising companies on their financing and strategic alternatives, his experience as a private equity manager working with companies and their management teams to grow and improve their businesses, and his deep knowledge of the Company given his initial tenure as a board member of the LLC.

**Defendant Lewis**

45.     Defendant Lewis served as a Company director from July 2019 to October 31, 2024. During her time as a Company director, she served as a member of the Compensation Committee and the Nominating and Governance Committee.

46.     The 2023 Proxy Statement stated the following about Defendant Lewis:

Ms. Lewis became a member of the Board in July 2019. Ms. Lewis has served on the boards of several private and public companies and is an independent consultant to product/service companies and fast-growing technology start-ups. Previously, she was Global Officer and Senior Vice President, Consumer & Market Knowledge of The Procter & Gamble Company, a consumer-packaged goods company, from 2008 through December 2014. Prior to that, she held a number of other leadership positions with Procter & Gamble Consumer & Market Knowledge, including Vice President, Global Operations and Director, North America. Ms. Lewis previously served as Board Chair of comScore, Inc. in 2016 and as a member of the Audit Committee and Chair of the Technology and Innovation Committee of comScore, Inc. from 2015 to 2016. Ms. Lewis has also previously served on the Singapore Industry Advisory Board for Consumer Insights, the Advertising Research Foundation Board of Directors, and the Business Advisory Council for the Farmer School of Business at Miami University. She holds a B.S. from Miami University. We believe Ms. Lewis is qualified to serve on the Board based on her experience working as a consultant to product/service companies, her background in consumer and market knowledge, her history as an executive at a global company and her prior service as a director of a public company.

**Defendant Murphy**

47.     Defendant Murphy has served as a Company director since February 2014 and serves as a member of the Compensation Committee and as a member of the Nominating and Governance Committee.

48.     The 2023 Proxy Statement stated the following about Defendant Murphy:

16

Mr. Murphy became a member of the Board in February 2014 in connection with the IPO. He is the founder and chief executive officer of Wentworth Capital Management, a private investment and venture capital firm focused on media, technology and branded consumer businesses. From 2009 to 2011, he served as president of strategy & development of Caesars Entertainment, where he was responsible for corporate strategy and growth, mergers and acquisitions, corporate development and real estate development around the world. From 2007 to 2008, Mr. Murphy served as an operating partner at Apollo Global Management and, prior to that, he spent 18 years in senior executive roles with The Walt Disney Company, including chief strategic officer of Disney and chief financial officer of ABC, Inc. Until 2019, Mr. Murphy served as a board member and chairman of the audit committee of Tribune Media (NYSE: TRCO), and was a board advisor to DECA TV. He has previously served as chairman of the board of Revel Entertainment and on the boards of The Stars Group, Inc., Dial Global and Fisher Communications. Mr. Murphy received an M.B.A. from the Wharton School of Business and a bachelor's degree, magna cum laude and Phi Beta Kappa, from Dartmouth College. We believe Mr. Murphy is qualified to serve on the Board because of his long history as an executive and director of national and international companies and experience facilitating international growth and strategy.

**Defendant Stokely**

49.     Defendant Stokely has served as a Company director since February 2014 and serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.

50.     The 2023 Proxy Statement stated the following about Defendant Stokely:

Mr. Stokely became a member of the Board in February 2014 in connection with the IPO. He has been the lead independent director of Pool Corporation (Nasdaq: POOL) since 2000 and has been its chairman of the board since May 2017. In addition, Mr. Stokely was president, chief executive officer and chair of the board of Richfood Holdings, Inc., a food retailer and wholesale grocery distributor, and he served as president of JES, Inc., an investment and consulting firm. Previously, he also served on the boards and committees of a number of other publicly traded companies, including ACI Worldwide, Inc., AMF Bowling, Imperial Sugar Company (which was previously a publicly traded company), O'Charley's Inc., Performance Food Group and Nash-Finch Company. Mr. Stokely received a bachelor's degree from the University of Tennessee. We believe Mr. Stokely is qualified to serve on the Board because of his extensive experience as a director of publicly-traded companies engaged in a variety of industries, strategic insights, distribution experience and senior leadership experience.

**Defendant Taylor**

17

51.     Defendant Taylor has served as a Company director since April 2023 and serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee.

52.     The 2023 Proxy Statement stated the following about Defendant Taylor:

Ms. Taylor became a member of our Board of Directors in April 2023. She previously served as the President and Chief Executive Officer of Tredegar Corporation, a global manufacturing company, from 2010 until 2015 and was a member of Tredegar's board of directors from early 2010 until June 2015. During her 24-year career with Tredegar, Ms. Taylor held a variety of leadership positions, including President of Tredegar Film Products, Senior Vice President, Strategy, and General Counsel. Ms. Taylor is currently a director of the following public companies: LL Flooring Holdings, Inc. (NYSE: LL), where she has served as chair of the board since November 2015, and TopBuild Corp. (Nasdaq: BLD), where she has served as chair of the governance committee since May 2019. Ms. Taylor is also a member of the nominating and corporate governance committee and the compliance and regulatory affairs committee of LL Flooring Holdings, Inc. and a member of the audit committee and compensation committee of TopBuild Corp. Ms. Taylor was a member of the board of directors of Verso Corporation from November 2019 through March 2022, where she served as chair of the audit committee and as a member of the compensation committee and the corporate governance and nominating committee. Ms. Taylor also serves on the board of the Boys & Girls Club of Metro Richmond (Virginia). Ms. Taylor holds a bachelor's degree in Political Science from the College of the Holy Cross and a J.D. degree from The Catholic University of America, Columbus School of Law. We believe Ms. Taylor is qualified to serve on the Board based on her many years of experience in senior management in both operational and commercial leadership roles, including serving as chief executive officer of a publicly-traded global manufacturer, her strong knowledge of corporate governance and her experience as a director of various public companies.

**Defendant Wilson**

53.     Defendant Wilson served as CFO and Secretary of the Company from November 2009 to April 19, 2023.

54.     The Schedule 14A the Company filed with the SEC on September 20, 2022 (the "2022 Proxy Statement") stated the following about Defendant Wilson:

Mr. Wilson has served as our Chief Financial Officer since November 2009. From September 2008 to November 2009, Mr. Wilson served on the LLC's executive board. Prior to joining Malibu Boats, Mr. Wilson was a vice president of Black

18

Canyon Capital LLC where he was employed since its founding in 2004. While at Black Canyon Capital, he was responsible for due diligence and execution of numerous acquisitions and financings. Prior to joining Black Canyon Capital, Mr. Wilson was an investment banker at Credit Suisse First Boston, where he gained experience advising and financing companies across a range of industries. Mr. Wilson received a B.A. in Business Economics from the University of California, Los Angeles.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

55.     By reason of their positions as officers, directors, and/or fiduciaries of MBI and because of their ability to control the business and corporate affairs of MBI, the Individual Defendants owed MBI and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage MBI in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of MBI and its shareholders so as to benefit all shareholders equally.

56.     Each director and officer of the Company owes to MBI and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

57.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of MBI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

58.     To discharge their duties, the officers and directors of MBI were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

59.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

19

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of MBI, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised a majority of MBI's Board at all relevant times.

60. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

61. To discharge their duties, the officers and directors of MBI were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of MBI were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, and the United States, and pursuant to MBI's own Code of Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how MBI conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of MBI and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that MBI's operations would comply with all applicable laws and MBI's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

21

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

62.     Each of the Individual Defendants further owed to MBI and the shareholders the duty of loyalty requiring that each favor MBI's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

63.     At all times relevant hereto, the Individual Defendants were the agents of each other and of MBI and were at all times acting within the course and scope of such agency.

64.     Because of their advisory, executive, managerial, directorial, and controlling positions with MBI, each of the Individual Defendants had access to adverse, non-public information about the Company.

65.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by MBI.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

66.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

67.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

22

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

68. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of MBI was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

69. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

70. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of MBI and was at all times acting within the course and scope of such agency.

## MBI'S CODE OF CONDUCT

71.     MBI's Code of Conduct states that it applies to ". . . all directors, officers, and employees of Malibu Boats, Inc. and its subsidiaries . . ."

72.     The Code of Conduct states that it requires:

- compliance with all applicable governmental laws, rules and regulations wherever Malibu operates;
- honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, and the appropriate self-disclosure to Malibu of any material transaction or relationship that reasonably could be expected to give rise to such a conflict;
- full, fair, accurate, timely and understandable reporting in Malibu's books and records and in all reports and documents that Malibu files with, or submits to, our external investors, accountants and auditors and in other public communications made by Malibu;
- prompt internal reporting of violations of this Code or of any law affecting Malibu's business; and
- accountability for failures to adhere to this Code.

73.     In the section "Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting," the Code of Conduct states, in relevant part:

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:
- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
-  transactions be supported by appropriate documentation;
- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
- employees comply with our system of internal controls; and
- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

24

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance team, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report such employee's knowledge promptly to a supervisor, the Compliance Officer, the Audit Committee or one of the other compliance resources described in Section 16 herein.

74. In the section, "Fair Dealing," the Code of Conduct states, in relevant part:

We strive to outperform our competition fairly and honestly. Advantages over our competitors are to be obtained through superior performance of our products and services, not through unethical or illegal business practices. Statements regarding Malibu's services must not be untrue, misleading, deceptive or fraudulent. Acquiring proprietary information from others through improper means, possessing trade secret information that was improperly obtained, or inducing improper disclosure of confidential information from past or present employees of other companies is prohibited, even if motivated by an intention to advance our interests. If information is obtained by mistake that may constitute a trade secret or other confidential information of another business, or if you have any questions about the legality of proposed information gathering, you must consult your supervisor or the Compliance Officer.

You are expected to deal fairly with our customers, suppliers, employees and anyone else with whom you have contact in the course of performing your job. Be aware that the Federal Trade Commission Act provides that "unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful." It is a violation of the Act to engage in deceptive, unfair or unethical practices and to make misrepresentations in connection with sales activities.

Employees involved in procurement have a special responsibility to adhere to principles of fair competition in the purchase of products and services by selecting suppliers based exclusively on normal commercial considerations, such as quality, cost, availability, service and reputation, and not on the receipt of special favors.

75.    In the section, "Insider Trading," the Code of Conduct states, in relevant part:

Directors, officers and employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Directors, officers and employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading Policy for more detailed information.

76.    In the section, "Waivers of the Code of Conduct," the Code of Conduct states, in relevant part, that: "Any waiver of this Code may be made only by the Board to the extent necessary and warranted and will be promptly disclosed if required by law or regulation of any applicable securities exchange or market."

77.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to, breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, violations of the Exchange Act, and unjust enrichment. Moreover, two of the Individual Defendants violated the Code of Conduct by engaging in insider trading while in possession of material nonpublic information before the scheme was exposed. Also, in violation

26

of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of MBI's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## MBI'S AUDIT COMMITTEE CHARTER

78.     The Company also maintains an Audit Committee Charter. Under a section titled "Purpose," the Audit Committee Charter states the following about the Audit Committee's main objective:

> The Committee is appointed by the Board to assist the Board in, among other things, overseeing the accounting and financial reporting processes and the audits of the financial statements of the Company and its financial risk management policies and controls and assisting the Board in fulfilling its responsibility for oversight of the quality and integrity of the accounting, auditing, internal control and financial reporting practices of the Company. In addition, the Committee is appointed by the Board to assist the Board in overseeing the Company's risk management with respect to data privacy, cybersecurity and information technology risks

79.     Under a section titled "Responsibilities and Authority," the Audit Committee Charter outlines the Audit Committee's responsibilities, stating, in relevant part, as follows:

> The Committee's responsibilities are for oversight, as described under "Purpose" above. The members of the Committee are not employees of the Company, and they do not perform management's functions. The Committee shall have the following responsibilities; provided, however, that this list of responsibilities is intended to be a guide and to remain flexible to account for changing circumstances and needs. Accordingly, the Committee may depart from or supplement such responsibilities, and establish policies and procedures, to the extent permitted by applicable law and Nasdaq listing requirements. The Board will retain the right to act on all such matters without limiting the Committee's authority, subject to compliance with applicable law and Nasdaq listing requirements.
>                                                  ***
>         (7) ***Annual and Quarterly Results***. Review the Company's audited financial statements and quarterly financial results, including the related disclosures required by generally accepted accounting principles in the United States ("GAAP") and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and discuss them with management and the independent auditors. These discussions shall include any

27

significant changes to the Company's accounting principles, the matters required to be discussed under the requirements of the PCAOB, the consideration of the quality of the Company's accounting principles as applied in its financial reporting, including a review of particularly sensitive accounting estimates, reserves 3 and accruals, judgmental areas, audit adjustments (whether or not recorded), the effect of regulatory and accounting initiatives as well as off-balance sheet structures on the financial statements of the Company, the Company's implementation process for any new accounting standards and other such inquiries as the Committee or the independent auditors shall deem appropriate as required to be communicated by the independent auditors to the Committee with respect to the review or audit of the Company's financial statements pursuant to applicable auditing standards adopted by the PCAOB. Based on such review, the Committee shall make its recommendation to the Board as to the inclusion of the Company's audited financial statements in the Company's Annual Report on Form 10-K. The Committee shall review and resolve any disagreements among management and the independent auditors or the internal auditing department in connection with the preparation of the audited financial statements or the quarterly financial statements.

(8) *Proxy Report*. Issue annually a report of the Committee to be included in the Company's proxy statement as required by the rules and regulations of the SEC.

***

(12) *Press Releases*. Review and discuss with management, prior to release, the Company's earnings press releases, including the use of "pro forma" or "adjusted" non-GAAP financial information, as well as financial information and earnings guidance provided to analysts or rating agencies.

(13) *Material Auditor Communications.* Review and discuss with the auditors and, if appropriate, management any audit opinion provided by the independent auditors and all other material written communications between the independent auditors and management including, but not limited to, any management letter or internal control letter or schedule of unadjusted differences, as well as any communications between the audit team and the independent auditor's national office with respect to accounting or auditing issues presented by the engagement.

(14) *Other Financial Disclosures*. Discuss with a representative of management and the independent auditors: (i) the interim financial information contained in the Company's Quarterly Report on Form 10-Q prior to its filing; (ii) the earnings announcement prior to its release (if practicable); and (iii) the results of the review of such information by the independent auditors. These discussions may be held with the Committee as a whole or with the Chair in person or by telephone.

(15) *Internal Audit*. Oversee the internal audit function, which may be outsourced to a third-party service provider, including by (a) reviewing the appointment and performance of the head of internal audit, and making recommendations to the Board and management regarding responsibilities, retention, or termination; (b) reviewing summaries of significant reports to management prepared by the internal auditor and management's responses; and (c)

28

discussing with management and the independent auditor the internal auditor's responsibilities, activities, organizational structure, staffing, qualifications, and budget. 4 (16)

(16) ***Internal Control Over Financial Reporting***. Discuss and review with management, the internal auditors and the independent auditors, in connection with each annual or quarterly report filed with the SEC, the quality and effectiveness of and compliance with the Company's internal control over financial reporting, whether prior recommendations concerning internal controls made by the independent auditors have been implemented by management, and the adequacy of any disclosures about changes in internal control over financial reporting. This should include a discussion of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that includes management or other employees who have a significant role in the Company's internal control over financial reporting. On an annual basis, obtain a written report from management that describes management's own assessment of the effectiveness of such internal control over financial reporting and review the independent auditors' attestation of management's report prior to the filing of the Company's annual report on Form 10‑K.

***

(18) ***Review of Financial and Accounting Practices.*** Review with the independent auditors and management the extent to which changes or improvements in financial or accounting practices suggested by the auditors, as approved by the Committee, have been implemented. This review should be conducted at an appropriate time subsequent to implementation of changes or improvements, as decided by the Committee.

(19) ***Legal Matters and Correspondence with Regulators***. Discuss with management and/or the Company's legal counsel any legal matters (including the status of pending litigation) that may have a material impact on the Company's financial statements or accounting policies, and any material reports or inquiries from regulatory or governmental agencies.

(20) ***Fraud and Regulatory Noncompliance***. Review all reports concerning any fraud or significant regulatory noncompliance that occur at the Company. This review should include, at a minimum, consideration of the Company's internal control over financial reporting that should be strengthened to reduce the risk of a similar event in the future and the impact on previously issued financial statements and reports filed with governmental authorities.

***

(27) ***Related Party Transactions***. Approve all "related person transactions," as described in Item 404 of Regulation S-K, as promulgated by the SEC in accordance with the Related Person Transaction Policies and Procedures adopted by the Board and as required by Nasdaq rules.

(28) ***Risk Assessment and Management***. Discuss with management and the independent and internal auditors the Company's major financial risk exposure and the steps management and the independent and internal auditors have taken to

29

monitor and control such exposure, including the Company's risk assessment and risk management policies.

80.     In violation of the Audit Committee Charter, the Individual Defendants failed to adequately review and discuss the Company's annual and quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background on MBI*

81.     MBI is a recreational activity company whose principal activity is the design, production, and marketing of recreational powerboats, including but not limited to performance sport boats, sterndrive, and outboard boats. MBI chiefly sells its products under eight brands and held the top U.S. market share position in the performance sport boat category as of June 30, 2024. MBI offers boats to accommodate a variety of water-based activities, including water sports, fishing, and boating in general.

82.     MBI's method of business centers around its network of independent dealers, with the dealers utilizing third-party financing agreements to facilitate purchases. Dealers receive a line of credit from the lender to purchase boats and pay the lender a portion of their sales when a boat is sold to a customer. As such, MBI recognizes a sale and receives payment as soon as a boat is shipped to a dealer. Among MBI's most significant dealers was Tommy's.  In the fiscal years 2022 and 2023, Tommy's represented 9.4% and 10.7% of MBI's consolidated net sales respectively. Further, Tommy's represented roughly 23.3% of net sales for the Malibu Segment in the 2023 fiscal year.

30

83.     Prior to the start of the Relevant Period, MBI experienced significant growth in large part due to increased demand in light of the COVID-19 pandemic. Between fiscal years 2020 and 2021, the Company's sales grew 42%, and between fiscal years 2021 to 2022 the Company's sales grew a further 30%. However, the COVID-19 sales boom began to dissipate by mid-2022, as sources within the industry predicted 2023 demand to be roughly 50% less than in 2022.

### The Channel Stuffing Misconduct

84.     Following growing industry demand spurred by COVID in fiscal years 2021 and 2022, analysts for the boating market anticipated that demand would fall by roughly 50% in 2023 as a result of recessionary pressures post-COVID. As a result, the Individual Defendants, who worried that the abrupt halt of MBI's record-setting sales would detrimentally affect their compensation, concocted a plan whereby the Company would utilize its significant leverage over Tommy's to pump Tommy's dealerships with excess inventory as a means to prop up MBI's sales, artificially inflate the Company's financial performance, and disguise the effects of the post-COVID decline in demand on the Company.

85.     As Tommy's later alleged in its action against MBI that, at all relevant times, Defendants "pump[ed] Tommy's full of boats" despite "fully know[ing]" that Tommy's did not need or want the excess inventory since "the market analysis did not warrant such inventory levels." In relevant part, Tommy's alleged: "***Malibu intentionally and fraudulently demanded that Tommy's increase its floor plan capability and proceeded to 'pump Tommy's full of boats'*** (the most expensive, highest margin, slow selling Malibu boats) ***with full knowledge that the market analysis did not warrant such inventory levels***, all with the intention of increasing [MBI's] market share and artificially inflating its stock price during a historically low market demand."

   **i.     Defendants Begin Engaging in the Channel Stuffing Misconduct in Mid-2022 by "Pump[ing] Tommy's Full of Boats"**

31

86.     In mid-2022, toward the beginning of fiscal year 2023, the Company began pushing Tommy's to substantially increase its line of credit for financing of its floor plan so that it could buy significantly more boats from MBI; notably, and as mentioned above, these were boats that, in consideration of the anticipated downturn in retail demand, Tommy's neither needed nor wanted. However, in an attempt to get Tommy's to fall in line with its plans, the Company threatened to revoke Tommy's standing as an authorized Company dealer, and withhold handsome incentive payments that it was qualified to receive, if it did not comply. In particular, in July 2022, Defendants Springer and Wilson met with Borisch and Ed Wells, his director of operations. At the meeting, Defendants Springer and Wilson purportedly "began pressuring Mr. Borisch to commit to increasing [Tommy's] existing floor plan credit capacity" so Tommy's could purchase more of MBI's boats. After Borisch "pushed back, both in the initial meeting [in July 2022] and over the months that followed, ***Malibu made clear that its request was not optional, and that Mr. Borisch would lose his status as a Malibu dealer if he did not comply.***" Moreover, with respect to the handsome financial incentives Tommy's had earned during the 2022 fiscal year (which the Company had not yet paid), Defendants withheld such incentives to further pressure Tommy's into expanding the financing capacity of its floor plan, while simultaneously threatening that they "***would retaliate if [Tommy's] did not comply with their demands.***"

87.     Later in 2022, around the same time that market analysts anticipated there would be a decline in market demand for boats, Defendants informed Tommy's that it would need to maintain a minimum of 25 weeks of Malibu Segment inventory on hand, allegedly based on the Company's own internal retail demand forecasts for the 2023 fiscal year. Tommy's had, at that time, only spent approximately $30 million of its $50 million credit facility for floor plan financing with Fifth Third Bank, its lender, leaving $20 million of additional capacity to remain. In order to

32

meet the Company's new requirement that it have 25 weeks of inventory on hand, Tommy's would need to increase its existing floor plan capacity by more than a factor of five. In addition, Borisch noted in Tommy's court filings how, in an effort to make sure Tommy's complied with the new requirement, on or around December 16, 2022, "[Defendant] Wilson called Mr. Borisch's primary point of contact with [Fifth Third] bank, Rick Budinger, *and demanded that the bank immediately fund the boats that Malibu had stripped or else 'bad things would happen.'*" Following these threats, Tommy's agreed to comply with the Company's demands, thereafter expanding its Fifth Third Bank credit facility from $50 million to *$85 million, or more than 70%*.

88.     Despite making these expansions to its floor plan capacity, such expansions soon proved inadequate for Defendants since shortly after Tommy's made its expansion, the Company was hit even more severely by the growing decline in retail demand. Plaintiff's investigation in the Securities Class Action brought to light that, in early 2023, the Company's largest overall dealer and Malibu Segment dealer for the last two fiscal years, OneWater, cancelled a substantial portion of its boat orders from the Company for the 2023 fiscal year, particularly its orders for Malibu Segment boats. Indeed, OneWater cancelled such a large number of Malibu Segment boat orders that it reduced OneWater's percentage of Malibu Segment sales from 18.4% during the 2022 fiscal year to just 6.5% in the 2023 fiscal year.

89.     Notably, OneWater decided to cancel these orders following its own internal assessment which found that, as a result of the post-COVID recessionary environment, demand for Malibu Segment boats across its 100 dealership locations was falling dramatically in 2023 and would continue to fall for the foreseeable future. A former Senior Sales Executive of OneWater who was interviewed in the Securities Class Action ("CW 1") noted that, by early 2023, OneWater knew about the downturn in the retail market for boats. As a result, OneWater predicted that there

would be a consistent decline in the Company's retail boat sales, incentivizing Austin Singleton ("Singleton"), its CEO, to meet with Defendant Springer in early 2023. At this meeting, OneWater, through Singleton, cancelled a substantial amount of its boat orders from the Company for the 2023 fiscal year, which CW 1 noted was done because "the COVID years were done."

90. Similarly, a former Company employee interviewed in the Securities Class Action who worked as a Data and Analytics Specialist in MBI's Market Research department between December 2021 and January 2024 ("CW 2") confirmed that the Company's own internal data for the market indicated that, starting in early 2023, there was a steep drop-off in retail demand for the Company's boats. CW 2 noted that he was tasked with collecting retail boat registration and customer survey data for the Company's boats that had been sold to customers through a program called Qualtrics. CW 2 would thereafter draft reports regarding trends within that data, which CW 2 circulated to his superiors and the Company's CEO and Board on a quarterly, monthly, and sometimes weekly basis. By reviewing such registration data, CW 2 was able to determine how many Company boats had been sold to retail consumers in a given time period. Because such information gave CW 2 insight into levels of retail demand, CW 2 also sent his reports to the Company's sales department in an effort to assist them with their forecasting efforts. With respect to his reports, CW 2 stated: "There was a huge concern with the directors and the sales managers. They had a lot of questions about what I was presenting to them" and "whenever I was asked about this the same people would ask the sales department and be told that sales were [indeed] down."

    ii.    **In Early 2023, Defendants Pressured Tommy's to Prop Up Its Sales
           By Taking On Even More Inventory**

91. With demand in the market rapidly declining and MBI's largest dealer having cancelled a substantial amount of its boat orders from the Malibu Segment, Defendants knew that things were going downhill quickly and again used its leverage over Tommy's to pump it full of

34

more Malibu Segment inventory. In particular, early in 2023, the Company pushed Tommy's to increase its floor plan capacity even further, despite the fact that Fifth Third Bank, Tommy's lender, was unable to finance any additional sales as a result of Tommy's having hit its credit limit. As a result, Defendants introduced Tommy's to M&T Bank, a new lender, in March 2023; M&T Bank was willing to give Tommy's $110 million in floor plan capacity with a $20 million overlimit – adding up to *$130 million* total.

92. However, in an effort to reduce its own risks associated with loading so much surplus inventory into Tommy's so speedily, the Company made efforts to avoid standard provisions that would otherwise saddle the Company with some of the risk. In particular, the Company normally entered into "repurchase agreements" with its dealers' lenders; such agreements were standard in the industry and provided that the Company would repurchase unsold inventory from a dealer if the dealer were to default on replaying its lender for the boats. Notably, with the Tommy's lending, the Company did not enter into a repurchase agreement with M&T Bank despite the fact that this was an industry standard and that such agreements had been present in all of Tommy's prior financing arrangements with the Company. However, Defendants concealed this reality from Tommy's at all relevant times.

93. Following Tommy's securing the new financing agreement with M&T Bank on May 18, 2023, and with the Company's knowledge that no repurchase agreement was in place that could potentially harm MBI's financial standing, "*[MBI] began pumping inventory into Mr. Borisch's dealerships in order to artificially inflate its own numbers and increase its market share and stock price.*" The Company insisted that the majority of the surplus inventory it was pushing on Tommy's be made up of its highest margin Malibu Brand boats, as opposed to the more even split of Malibu Brand and lower-priced Axis brand boats that Tommy's had historically

carried. The sole purpose of such inventory agreement was to increase the Company's profits. Indeed, Tommy's, in light of the decrease in demand, had previously requested a larger share of the lower-priced Axis brand boats, but the Company ignored such requests and primarily delivered high-priced Malibu Brand boats to Tommy's instead. Moreover, when Tommy's tried to push back on MBI with respect to taking the surplus inventory, Defendants continued to use the incentive payments it owed to Tommy's (that had not yet been paid) as leverage. In particular, "[MBI Director of Sales] Scott Davenport, acting on behalf of Malibu, assured Mr. Borisch that *Malibu was honoring its agreement to pay the rebates and incentives, and pay for interest recovery, so long as [Tommy's] continued to take on the inventory, as Malibu was demanding.*"

94. A former Sales Representative for Tommy's Colorado dealership between June 2020 to November 2023 who was interviewed in the Securities Class Action ("CW 3") corroborated such allegations, noting that Tommy's Colorado dealership underwent a dramatic and sudden 50% expansion of its lot size in the summer of 2022 to accommodate the additional surplus of Malibu Segment boats that the Company would soon be delivering. CW 3 discussed how Tommy's dealership in Colorado originally included a lot that could hold approximately 100 boats in inventory, which had been an adequate amount of space for the dealership for 2020, 2021, and for the first half of 2022. However, in the summer of 2022, the dealership expanded, with Tommy's buying an additional lot down the street from its showroom, thereby increasing its floor plan capacity by an extra 50 boats, such that the dealership could now store approximately 150 boats in its inventory. Notably, this instantly *more than tripled* the dealership's former capacity. This expansion was a result of the ongoing pressure and retaliatory threats from the Defendants.

95. In addition, CW 3 noted how, each year, Tommy's Colorado dealership normally ordered a 50-50 split from the Company of Malibu Brand boats and Axis brand boats, and the

Company would produce and ship the boats to the dealership pursuant to that split. However, this process changed when the Colorado dealership ordered boats from the Company for boats to be shipped in 2023. In particular, even though the dealership had asked for the same 50-50 split for shipments of the Malibu Segment boats for the 2023 fiscal year, the Company instead abided by a 75-25 split for 2023, favoring the more expensive Malibu Brand boats.

96.     Pursuant to this scheme, between May and June 2023, the Company saddled Tommy's with an additional $50 million in excess inventory. This scheme allowed the Company to just barely meet its guidance for the 2023 fiscal year. In particular, the Company had previously represented, with respect to its guidance, that net sales would grow "slightly over 10%" from the 2022 fiscal year – suggesting consolidated net sales of approximately $1.34 to $1.35 billion. Moreover, by pushing Tommy's to take the surplus inventory, the Company was able to report revenue of $1.388 billion for the 2023 fiscal year, beating guidance by just $38 to $48 million. Notably, without the significant sales to Tommy's in May and June 2023, the Company would have failed to meet its projected guidance and analyst expectations.

### iii.    Defendants' Channel Stuffing Scheme Begins to Take Its Toll on Tommy's Business

97.     By the summer of 2023, the bloated inventory levels had begun to take their toll on Tommy's business. Still, Defendants continued to push Tommy's to take on additional surplus inventory, even though they knew such inventory was unnecessary. Indeed, on June 30, 2023, the dealership agreements between Tommy's and the Company for the 2023 fiscal year expired, pushing Tommy's and the Company to start negotiating the terms of new dealership agreements for the 2024 fiscal year. However, before such agreements could be executed, Tommy's and the Company needed to agree on the total number of boats Tommy's would commit to ordering from the Company for the year.

98.     As of June 12, 2023, Tommy's was still holding 800 of the 1,190 Malibu Segment boats it had bought from the Company in 2023- notably, ***nearly 70% of the previous year's boats***. Defendants had knowledge of this fact as well, given they were receiving near real time access to Tommy's inventory levels and retail sales and receiving updates on the same weekly. Indeed, CW 3 noted that he was involved in inputting sales data into the Company's portal to "register the sale" in the Company's tracking system, which MBI maintained to determine whether Tommy's was entitled to financial incentives under the dealership agreements. In addition, the dealership agreements Tommy's had with the Company for the 2023 fiscal year provided that "[u]pon delivery to the retail customer," Tommy's was to "complete the Warranty Registration card provided and forward to Malibu" – and that this needed to be executed "within 10 days after customer takes delivery of the boat."

99.     Despite being fully aware that Tommy's still had surplus inventory from the 2023 fiscal year, Defendants required that Tommy's agree to order 1,160 Malibu Segment boats during the 2024 fiscal year before the Company would commit to executing new dealership agreements with Tommy's for the upcoming year. In response, Tommy's offered to commit to ordering 559 boats, but Defendants refused. CW 3 recalled that, around the same time, "many dealerships [other than Tommy's] were holding off on placing and receiving model year 2024 orders" because "***everyone [still] had 2022 and 2023 excess Malibu inventory***." Such dealerships were also, like Tommy's, purportedly pushing back on the Company's growing demands for boat orders.

### iv.     Defendants Are Told in the Summer of 2023 About Tommy's Dire Financial Condition

100.     In its court filings, Tommy's noted that, by summer of 2023, it was in a dire financial condition, stating that it was rapidly "nearing danger with respect to [its] current inventory due to the unreasonable number of Malibu boats that Malibu had forced upon

38

[Tommy's]" and that "[b]y August 2023, [Tommy's] dealerships were in a dire financial position." As a result, in August 2023, Tommy's made an attempt to avoid insolvency and effectively manage its costs by selling a number of boats from its inventory without remitting the required portion of those sales proceeds to M&T Bank, a serious default event in the marine industry known as "sales out of trust," or "SOT." Notably, this was the first event of an SOT in Tommy's entire 12-year history with MBI.

101.    On or around September 2, 2023, Tommy's informed the Company about the receipt of its SOT status, and the following day, Tommy's contacted MBI for help in right-sizing its overstocked inventories and for payment of outstanding financial incentives and monetary advances from the Company which Tommy's alleged it could utilize to cure its default with M&T Bank. However, Defendants refused to make payment on any of the outstanding financial incentives, arguing that Tommy's was not eligible to receive them.

102.    After Tommy's informed the Company of its SOT status, Defendant Springer told Tommy's that the Company would not be entering into any new dealership agreements with it. At that point, almost all of the prior dealership agreements for Tommy's 15 dealerships had already expired, meaning virtually no dealership agreements existed anymore between MBI and Tommy's. Defendant Springer knew the reality of Tommy's dire financial situation; for example, he emailed Borisch on September 11, 2023, writing: "***Tommy's is SOT, which is one of the worst situations that can arise. Until Tommy's is in good standing with M&T, no dealer agreement can or will be signed***."

103.    Defendants knew that the reality of Tommy's being on the verge of total financial collapse was extraordinarily material information to investors. Indeed, Tommy's was the Company's single most important dealer, such that in the Company's own SEC filings, Tommy's was one of only two dealers the Company referenced directly by name. For example, the FY 2023 10-K (defined below) stated that "[s]ales to our dealers under common control of Tommy's Boats represented approximately

39

10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021 respectively, including approximately 23.3% . . . of consolidated sales in fiscal year 2023 for Malibu[.]"

104.    However, even though Defendants were fully aware that Tommy's was quickly nearing insolvency as a result of the Channel Stuffing Misconduct, Defendants concealed all of this material information from investors, while at the same time continuing to push Tommy's into purchasing ***an additional 131 boats***, despite the fact that there was no dealership agreement between the parties anymore.

> **v.    Defendants Continuously Mislead Investors About the Retail Demand for MBI's Boats, Among Other Things**

105.    Throughout the Relevant Period, the Individual Defendants continued to misrepresent the true nature of supply and demand for the Company's products. Despite the ongoing scheme to offload large quantities of product on Tommy's, the Individual Defendants trumpeted the "normalization" of inventory, in reference to achieving a balance between supply and demand. On May 3, 2023, Defendant Springer noted in a press release that inventory levels were reaching normalization and also stated that "***we know how much weeks on-hand of inventory that our dealers should have. [. . .] we know what the right level of inventory on-hand should be. And so that's something that I think that not only us but most marine companies have gotten very good at managing.***"

106.    The Individual Defendants continued to champion the Company's efforts to balance supply and demand for its products, despite carrying on a scheme in which its dealers were saddled with far more product than current consumer demand called for. On August 29, 2023, the Company released a press release in which Defendant Springer stated "***we remain confident in our operational prowess to match wholesale and retail demand[.]***"

40

### vi. The Truth About the Channel Stuffing Conduct Comes to Light

107.     The truth began to emerge on January 30, 2024 when the Company issued a press release concerning its financial results for the second quarter of fiscal year 2024. The Company reported an approximately 38% decline in sales, 44% decline in unit volumes, and a 60% adjusted EBITDA decrease year-over-year. Additionally, the Company announced a second reduction in guidance for the 2024 fiscal year. In the press release, Defendant Springer stated: "*[w]e are recalibrating wholesale production to match retail demand, as seasonality along with continued interest rate pressures has resulted in elevated inventory levels.*" Defendant Springer also noted "*channel inventories [were] higher than we, or our dealers would like to see,*" and, specifically, MBI dealers had "*around 5 weeks too much on hand inventory.*"

108.     On this news, the price per share of the Company's common stock fell nearly 20% in one day—or $9.47 per share—on unusually high volume, from a closing price of $51.03 per share on January 29, 2024 to close at $41.56 per share on January 30, 2024.

109.     The truth continued to emerge on April 10, 2024 when Tommy's filed a complaint against the Company for various claims, including breach of obligation under dealership agreement, promissory estoppel, and intentional and negligent misrepresentations relating to the parties' commercial relationship. Specifically, the complaint alleged that MBI perpetrated "an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value…" Subsequently, the Company filed a Form 8-K with the SEC acknowledging both the termination of its relationship with Tommy's and the lawsuit Tommy's filed against it.

41

110.     The truth fully emerged on May 2, 2024 when the Company released its financial results for the third quarter of fiscal year 2024. Notably, the Company reported *a 46% drop in new sales from the prior quarter*, and a 70% drop in Adjusted EBITDA. As such, the Company projected that consolidated net sales for the fiscal year of 2024 would be 40% lower than the previous year. Defendant Springer attributed these adjustments to "weakened retail environment characterized by lingering uncertainty and softened retail demand," as well as excess inventory. Defendant Springer stated that the Company needed to "*focus on channel inventory reductions through the remainder of fiscal year '24,*" by reducing boat production *"even further to reach our goals of continuing to optimize the channel inventory,*" and noted that product inventory was still four weeks too high.

111.     On this news, the price per share of the Company's common stock fell $1.27 per share, or nearly 4%, on unusually high trading volume, from a closing price of $33.06 per share on May 1, 2024 to close at $31.79 per share on May 2, 2024.

## FALSE AND MISLEADING STATEMENTS

### November 4, 2022 Earnings Call

112.     On November 4, 2022, the Company hosted an earnings call to discuss its financial results for the first quarter of fiscal year 2023, which MBI had reported earlier that day. During the call, Defendant Springer emphasized MBI's purportedly robust retail demand, stating "*Malibu Boats kicked off fiscal year 2023 with a splash as our continued momentum was supported by ongoing demand strength in both our fresh and saltwater businesses.*" In addition, Defendant Springer continued to tout the purported demand for MBI products, stating that it was so strong that "*our customers are gobbling [our boats] up like [a Cajun] deep fried turkey dinner at Thanksgiving.*" He also boasted that "*Malibu and Axis [we]re outperforming on every metric,*"

supported by the incredible reception of our new model year lineup [and] ***demand remains strong.***"

113.     Later during the earnings call, an analyst asked, given "where interest rates are" and "given some of the macro concerns out there," what "the dealer['s] appetite to carry inventory in the off-season right now" was. Defendant Springer responded, stating: "actually, I would say that ***across the board and everyone with dealer meetings, there was optimism and almost the demand to get more inventory.***"

114.     The statements in ¶¶ 112-113 were materially false and misleading and omitted material facts. Defendants were quite aware that demand for MBI products was not nearly as strong as they had relayed to investors, evidenced by the fact that MBI's two largest dealers already possessed overloaded inventories and did not request further products. Notably, the dealer OneWater would go on to cancel additional orders of MBI products due to excessive inventory, and the dealer Tommy's would eventually go bankrupt due to ordering far more MBI products than demand existed for.

***February 7, 2023 Earnings Call***

115.     On February 7, 2023, the Company hosted an earnings call to discuss its financial results for the second quarter of the 2023 fiscal year, which MBI had reported earlier that day. During the call, Defendant Springer relayed to investors that demand for MBI product remained "strong" and that, as such, MBI would meet or exceed its guidance for the 2023 fiscal year. In relevant part, Defendant Springer stated: "***The retail environment remains resilient with strong demand carrying the tide for our premium boats***" and that "***we see no worsening of our expected outlook.***"

43

116.    Defendant Springer went on to contrast decreasing demand for other boat manufacturers with the purported robustness of MBI's business profile in light of a decline in economic conditions and rising interest rates. In relevant part, Defendant Springer stated:

> It is important to note that while retail demand has disproportionately affected more entry-level aluminum-based lower-length boats, our customers remain unfazed. ***Speaking for MBI brands and for what we are generally seeing at [boat] shows, the premium buyer is looking to purchase and has not really been affected by economic conditions or interest rates***. . . Conversely, we are hearing of weakness in the smaller foot-length segments in entry-level priced boats. This consumer profile has been impacted the most by inflation and interest rates. ***Thankfully, that is not our model, and we remain positive on our premium business.***

117.    Later during the earnings call, Defendant Springer also stated to investors that "[o]ur unit volumes continue to climb[,]" and that both retail and wholesale demand for the Company's products remained so robust that "***[m]eeting existing demand and building channel inventories continues to be a primary focus and a major tailwind in the quarters to come[.]***"

118.    Also during the earnings call, Defendant Wilson represented to investors that the Company's net sales increased 28.4% and unit volumes increased 17.7% during the second quarter. Defendant Wilson alleged that such increases were "***generated by resilient wholesale demand across all 3 segments.***" Defendant Wilson also added that "Malibu is in an enviable position as we continue to capitalize on this resilient demand environment[,]" and also reiterated that "our expectations for fiscal year 2023 remain unchanged[.]"

119.    The statements in ¶¶115-118 were materially false and misleading and omitted material facts. Defendants were quite aware that demand was not as "strong" or as "resilient" as they portrayed to investors, and that MBI customers were in fact affected by rising interest rates and a worsening economy. This is evidenced by the fact that Defendants enacted an inventory pumping scheme to inflate MBI sales by forcing MBI products onto the dealer Tommy's despite

44

insufficient consumer demand. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

**May 3, 2023 3Q 2023 Press Release**

120.    On May 3, 2023, following the close of market, the Company issued a press release announcing its financial results for the third quarter of the 2023 fiscal year. Defendants also raised the Company's guidance for the fiscal year, with the purported expectation that MBI's net sales growth would rise to be over 10% year-over-year. In the press release, Defendant Springer relayed to investors that the Company was "normalizing"[3] its inventory, stating: "***[w]e have made great strides in normalizing our channel inventory***, particularly within our Malibu and Cobalt segments, ***allowing our dealers to be poised to satisfy customer demand as we enter the prime selling season.***"

121.    The statements in ¶120 were materially false and misleading and omitted material facts. Despite claiming that MBI was in the process of normalizing its inventory, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate sales figures. As such, Defendants were not attempting to balance consumer demand with inventory supply, and MBI's dealers already possessed more inventory than they needed or wanted. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

**May 3, 2023 3Q2023 Earnings Call**

122.    Also on May 3, 2023, the Company hosted an earnings call to discuss its financial results for the third quarter of the 2023 fiscal year. During the call, an analyst inquired about how

_____

[3] i.e. harmonizing inventory supply with consumer demand.

the Company was able to report yet another quarter of increasing sales despite marine industry sources reporting a decline in demand. Defendant Springer responded by stating:

> I think you have to take a step back. You have to understand where we're coming out of. You have a retail environment that has been very low on inventory. And it's a real easy arithmetic equation in terms of -- you know that *your inventories are down. You have to build that retail inventory out by shipping wholesale. . . . [T]he wholesale retail squaring has to do with the channel inventory. We have to put more inventory in the channel to realize the retail that we want to.*

123. Defendant Springer also discussed inventory levels for the Company's flagship product, Malibu Segment. Defendant Springer stated, with respect to inventory meeting customer demand, that "*Malibu is right where it needs to be in terms of what the historical norms have been in the channel.*" When asked by an analyst about the "slowdown in retail," Defendant Springer replied, "I wouldn't say we saw a slowdown in the quarter," instead alleging that MBI had only seen a "delay in the season kicking off because of the cool weather and because of the precipitation."

124. The statements in ¶¶122-123 were materially false and misleading and omitted material facts. Despite claiming that MBI was in a good position in terms of channel inventory and that MBI had not experienced a slowdown, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood channel inventory was not appropriate to meet consumer demand, and MBI's dealers already possessed more inventory than they needed or wanted. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### June 6, 2023 Baird Global Consumer, Technology & Services Conference

125. On June 6, 2023, Defendants Springer and Black attended the Baird Global Consumer, Technology & Services Conference on behalf of MBI. At the conference, an analyst

46

from Baird stated that "[e]veryone knows you want to be careful on inventory and it's your job to manage the right amount of inventory in the channel," and asked Defendants Black and Springer "[w]hat can you tell us about that inventory today in light of the retail expectation that you have?" In response, Defendant Black stated: "we feel, from a freshwater perspective, that that inventory level is probably pretty close to *normalized*[.]"

126.    Defendant Springer also replied by stating that MBI was utilizing a large data set to track dealer inventory, and that this allowed the Company to ". . . *know how much weeks on-hand of inventory that our dealers should have. [. . .] we know what the right level of inventory on-hand should be. And so that's something that I think that not only us but most marine companies have gotten very good at managing.*"

127.    Later during the conference, the same analyst asked: "how do you think interest rates have impacted your end consumer and also your dealer who's trying to finance all of this?" In response, Defendant Black relayed the same sentiment noted above that rising interest rates were inconsequential to MBI consumers. In relevant part, Defendant Black stated "So on the consumer side, I think it's important to keep in mind the demographic. So 50% of our customers are coming in and stroking a check when they purchase a boat. So *we haven't seen a meaningful impact at this point from the consumer side of things.*"

128.    The statements in ¶¶125-127 were materially false and misleading and omitted material facts. Despite claiming that MBI inventory was normalized and that they knew the appropriate levels of inventory to maintain, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood channel inventory was not appropriate to meet consumer demand, and MBI's dealers already possessed more inventory than they needed or wanted. Additionally,

47

Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### *August 29, 2023 FY 2023 Form 10-K*

129.    On August 29, 2023, MBI filed its annual report on Form 10-K with the SEC for the 2023 fiscal year (the "FY 2023 10-K"), which was signed by Defendants Springer, Black, Hooks, Buch, Chhina, Connolly, Lanigan, Lewis, Murphy, Stokely, and Taylor and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Springer and Black attesting to its accuracy. The filing of the FY 2023 10-K was the first time the Company acknowledged Tommy's in any of its SEC filings or investor communications. The FY 2023 10-K noted that Tommy's was MBI's second largest overall dealer, and the Company's largest dealer for the Malibu Segment. The FY 2023 10-K also stated that MBI possessed "little control over [its dealers'] activities," and that the Company "could" face financial repercussions from the loss of Tommy's as a dealer.

130.    With regard to Tommy's, the FY 2023 10-K stated "***Sales to our dealers under common control of Tommy's Boats represented approximately 10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021 respectively, including approximately 23.3% […] of consolidated sales in fiscal year 2023 for Malibu.***" Further, the FY 2023 10-K stated the following under the header "Risks Related To Our Dealers":

> We depend on our network of independent dealers, face increasing competition for dealers **and have little control over their activities.** Substantially all of our sales are derived from our network of independent dealers. Our top ten dealers represented 41.1%, 39.9% and 38.7% of our net sales for fiscal year 2023, 2022 and 2021, respectively. Sales to our dealers under common control of OneWater Marine, Inc. represented approximately 17.2%, 16.8% and 16.3% of consolidated net sales in fiscal years 2023, 2022 and 2021, respectively. Sales to our dealers under common control of Tommy's Boats represented approximately 10.7%, 9.4% and 7.3% of our consolidated net sales in the fiscal years ended June 30, 2023, 2022 and 2021

respectively. ***The loss of a significant number of these dealers could have a material adverse effect on our financial condition and results of operations.***

131. The statements in ¶¶129-130 were materially false and misleading and omitted material facts. Despite claiming that MBI possessed little control over dealer activities, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood MBI dealers did not possess as much control over their activities as the FY 2023 10-K intimated and that MBI's dealers already possessed more inventory than they needed or wanted. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly. Further, the FY 2023 10-K's statement regarding the potential financial risk of losing Tommy's as a dealer was misleading. Through their scheme, Defendants were already aware of Tommy's major financial predicament and indefinitely postponed new dealership agreements with Tommy's once the dealer's financial status became too dire. As such, Defendants knew the loss of Tommy's would negatively affect MBI's finances, not simply that the potential for negative consequences existed.

### *August 29, 2023 4Q and FY 2023 Press Release*

132. On August 29, 2023, after market close, the Company issued a press release regarding its financial results for the fourth quarter of the 2023 fiscal year as well as the full 2023 fiscal year. MBI reported net sales increasing 14% to a record $1.388 billion, strong gross margins at 25%, and Adjusted EBITDA growing 15% to a record $284 million, with Adjusted EBITDA margins increasing to 20.5%. In the press release, Defendant Springer stated the following: "We've made great strides to meet demand throughout the fiscal year as we ramped up production through our first three quarters and reached normalized channel inventories faster than anticipated. Despite

49

the uncertain macro environment, *we remain confident in our operational prowess to match wholesale and retail demand[.]*"

133.     The statements in ¶132 were materially false and misleading and omitted material facts. Despite claiming that MBI inventory was normalized and that they knew the appropriate levels of inventory to maintain, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood channel inventory was not appropriate to meet consumer demand, and MBI's dealers already possessed more inventory than they needed or wanted. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### August 29, 2023 4Q and FY 2023 Earnings Call

134.     Also on August 29, 2023, after market close, the Company held an earnings call regarding its financial results for the fourth quarter of the 2023 fiscal year as well as the full 2023 fiscal year. During the call, Defendant Springer stated "*[i]n 2023, channel inventories were still too low and production was in full throttle*, building boats to return back to where inventories had historically been." Defendant Springer went on to state:

> During the fiscal year, *we made great strides to match wholesale production to retail demand*, which we believe is important and responsible for our investors and our dealers. *The first three quarters of the year saw us matching our production to a deficient channel inventory environment to reach more normalized channel inventory levels.*

135.     Defendant Black supported the notion that MBI would keep "*matching wholesale to retail demand as we launch our new model year lineup,*" stating:

> While the outlook for fiscal year 2024 present some uncertainties, our unmatched innovation, product quality and team agility position us at the forefront of the marine industry. Despite this uncertainty, *we will continue to showcase our best-in-class operational capabilities, matching wholesale to retail demand as we launch our new model year lineup.*

50

136.    Later on during the earnings call, Defendant Springer reiterated the strength of consumer demand for MBI products. Defendant Springer stated while "dealers are concerned about the retail environment," it was "very clear that this is not 2009 when the customer disappeared. What ***we have been able to confirm is the retail customer is still there and willing to purchase*** [MBI products]."

137.    The statements in ¶¶134-136 were materially false and misleading and omitted material facts. Despite claiming that MBI inventory was normalized and that they knew the appropriate levels of inventory to maintain, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood channel inventory was not appropriate to meet consumer demand, and MBI's dealers already possessed more inventory than they needed or wanted. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

***September 15, 2023 Proxy Statement***

138.    On September 15, 2023, the Company filed the 2023 Proxy Statement with the SEC. Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, Stokely, and Taylor solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

139.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*: (1) reelect Defendants Chhina, Connolly, and Lanigan to the Board until the 2026 Annual Meeting of Stockholders; (2) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the fiscal year ending June 30, 2024 (the "2024 Fiscal Year");

51

and (3) to approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

140.    With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated:

The Board has adopted a Code of Conduct applicable to our employees, directors and officers and a Code of Ethics. The Code of Ethics applies to our principal executive officer, principal financial officer, principal accounting officer and controller, or persons performing similar functions. The codes are available on the Corporate Governance section of our website at investors.malibuboats.com/corporate-governance. To the extent required by rules adopted by the SEC or Nasdaq, we intend to promptly disclose future amendments to certain provisions of the codes, or waivers of such provisions granted to executive officers and directors on our website at www.malibuboats.com.

141.    Regarding the relationship between MBI's corporate governance and risk oversight, the 2023 Proxy Statement stated:

The Board believes that effective risk management involves our entire corporate governance framework. Both management and the Board have key responsibilities in managing risk throughout the Company, as shown below. Oversight of risks inherent in their respective areas of oversight are delegated to the various Board committees. At each regular meeting of the Board, the chairperson of each committee reports to the full Board regarding the matters reported and discussed at any committee meetings, including any matters relating to risk assessment or risk management. Our Chief Executive Officer, Interim Chief Financial Officer and outside legal counsel regularly attend meetings of these committees when they are not in executive session, and often report on matters that may not be otherwise addressed at these meetings. In addition, our directors are encouraged to communicate directly with members of management regarding matters of interest, including matters related to risk, at times when meetings are not being held. The Board believes that the processes it has established for overseeing risk would be effective under a variety of leadership frameworks and therefore do not materially affect its choice of leadership structure as described under "Board Leadership Structure" above.

142.    Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, Stokely, and Taylor caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) current wholesale and retail demand for MBI's products were far lower than reported; (2) as a result an incongruity existed between inventory supply and product demand; (3) the Individual Defendants were engaging in the Channel Stuffing Misconduct; and

52

(4) due to the foregoing, major MBI dealers were in serious financial predicaments due to dramatically enlarged inventories. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

143.   The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

144.   As a result of Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, Stokely, and Taylor causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Chhina, Connolly, and Lanigan to the Board until the 2026 Annual Meeting of Stockholders; (2) ratify the appointment of KPMG LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year; and (3) approve, on a non-binding advisory basis, the compensation of the Company's named executive officers.

### *September 21, 2023 D.A. Davidson Diversified Industrials & Services Conference*

145.   On September 21, 2023, Defendants Springer and Black attended the D.A. Davidson Diversified Industrials & Services Conference on behalf of the Company. In response to an analyst's question concerning demand trends from consumers and dealers, Defendant Springer replied:

One of the things that we're seeing, if you look at our demographic, *we have with Malibu [Brand]*, Cobalt, and Pursuit, *a very high net income wage earner.* The demographic shows that the annual compensation [sic] is about $500,000 and they are worth well over $1 million a year. *That consumer continues to be very consistent. They continue to buy boats…*

\* \* \*

[W]here you see and I think that across the marine industry, part of what is happening is that people who are buying on the interest rates that are using interest rates have seen that interest rate increase. And so the 16-foot to 22-foot segment, the smaller aluminum boats, they're probably most stressed, without a doubt. We don't play in either one of those categories. *We play in a larger category and also a more premium category.*

146.    During the conference, analysts asked a question regarding how MBI was positioned in relation to current macroeconomic trends. Defendant Springer stated that MBI was "*very well positioned*" because "*we are a premium brand, because our customers are very well off and they're buying the product* that they want."

147.    Also during the conference, an analyst asked a question concerning the inventory heath of MBI's dealers. In response, Defendant Springer stated: "*we're very focused on trying to read and understand what's happening at the retail level and then matching our supply to that* . . . we have taken back production so that we're matching that retail environment." When asked about MBI's guidance for FY 2024, Defendant Springer stated:

So I do think that from a data point of view and how we analyze the market, *we are, as I said, very focused on the supply retail matching. And so from what we see, what we're hearing from our dealers is that we feel pretty confident in what that's going to be.* Yeah, in terms of – of their guide, one of the things that I will tell you is that, as we got to June 30, they had about five weeks more of inventory on hand in the channel. So they put more inventory out than we did and so I think that's influencing their guide.

148.    In addition, an analyst asked a question concerning the overall health of MBI's dealer network. Defendant Springer stated: "*we have [a] very good dealer network, especially on the Malibu and Cobalt side.*"

54

149. The statements in ¶¶145-148 were materially false and misleading and omitted material facts. Despite claiming that MBI inventory was balanced with demand and that its dealer network was strong, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood MBI's dealers already possessed more inventory than they needed or wanted, and that the health of the network was not as strong as intimated. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### *October 31, 2023 1Q2024 Form 10-Q*

150. On October 31, 2023, after market close, the Company released its financial results for the first quarter of the 2024 fiscal year. Despite surpassing quarterly expectations, net sales and unit volumes decreased significantly compared to the first quarter of the 2023 fiscal year. As such, the Company announced that its guidance for the 2024 fiscal year would be lowered. That same day, the Company filed its Form 10-Q with the SEC. The Form 10-Q noted that MBI ". . . *continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023.*"

151. More specifically, the Form 10-Q stated:

Current inventory levels have now stabilized to pre-pandemic levels across all of our segments. While retail activity at our dealers trended lower during fiscal year 2023, given low inventory levels at the beginning of the fiscal year, *we continued to experience strong wholesale demand throughout the first three quarters of fiscal year 2023.* Now, as *channel inventory is normalized*, we believe wholesale demand will be directly dependent on the underlying retail activity for our products into the first half of fiscal year 2024.

152. The statements in ¶¶150-151 were materially false and misleading and omitted material facts. Indeed, despite claiming that MBI "continued to experience strong wholesale demand," Defendants concealed the reality that they were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such,

55

Defendants understood MBI's dealers already possessed more inventory than they needed or wanted and, thus, that wholesale demand for MBI products was not as "strong" as portrayed. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### October 31, 2023 1Q2024 Earnings Call

153.     Also on October 31, 2023, after market close, the Company hosted an earnings call concerning the first quarter of the 2024 fiscal year. Defendant Springer explained that the decreased noted in its financial results was due to the normalization of retail supply and demand. Defendant Springer stated "we have ***worked diligently to match wholesale supply to retail demand by quickly aligning production levels throughout the quarter, which accounts for the decrease versus last year.***" When asked to explain the decision to reduce guidance for the 2024 fiscal year despite the prevailing opinion that sales were reasonable, Defendant Springer stated:

> ***I think it's a dealer psyche. It's also the consumer psyche.*** And I can't belabor enough that anyone that's going to be purchasing on interest rates, they're probably sitting on the sidelines. If you look back to 2021, 2022, the interest rates that they're paying are up to 4x more than what they were paying back then. So I think that's a big impediment to the retail consumer psyche. The dealers are certainly paying more, they want to carry less inventory. That factors into it.

154.     Later on during the earnings call, Defendant Springer stated "we are certainly laser-focused on [dealer] inventory levels." Defendant Springer added that "***[a]n important element to our playbook is successfully matching production to retail demand***, not only to protect our margins, but ***also to protect our dealers and make sure they stay healthy[,]***" which is "a ***key differentiator*** for Malibu." He also noted that ***channel inventories had "normalized"*** and stated that "***our nimbleness to slow down our build schedule has helped our dealers to have healthy inventories, enabling them to sell through mid-year 2023 inventory more quickly.***"

56

155.    Also during the earnings call, Defendant Springer held the following exchange with an analyst:

> Craig R. Kennison, Robert W. Baird & Co. Incorporated, Research Division: *I wanted to ask about your dealer network and the health of that network, given carrying excess inventory maybe and facing higher interest expense. Any concerns about your network or the broader marine dealer network?*
> Jack D. Springer, CEO & Director: *Largely, no*, Craig. I mean, you always have some that you watch a little bit more closely. We're very in tune with Wells Fargo and what they're seeing. *And the early warning systems that are in place*, that did not exist in 2008 and 2009. *So we feel pretty confident*.

156.    The statements in ¶¶153-155 were materially false and misleading and omitted material facts. While claiming that MBI "worked diligently to match wholesale supply to retail demand" and that there was little concern for the health of MBI's dealer network, Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood MBI's dealers already possessed more inventory than they needed or wanted, and thus that MBI was not "working diligently" to match wholesale supply with retail demand. Further, Defendants understood that MBI's dealer network was not as healthy as portrayed, given the excess inventory its dealers possessed at Defendants' insistence. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### THE TRUTH BEGINS TO EMERGE AS THE FALSE AND MISLEADING STATEMENTS CONTINUE

*January 30, 2024 2Q2024 Press Release*

157.    On January 30, 2024, after market close, the Company issued a press release concerning its financial results for the second quarter of fiscal year 2024. The Company reported an approximately 38% decline in sales, 44% decline in unit volumes, and a 60% adjusted EBITDA decrease year-over-year. Additionally, the Company announced a second reduction in guidance for the 2024 fiscal year. In the press release, Defendant Springer stated: "*[w]e are recalibrating*

57

**wholesale production to match retail demand, as seasonality along with continued interest rate pressures has resulted in elevated inventory levels.**" Springer also stated "we are starting to see some positive signs following our Year End Sales event for Malibu, demonstrating the resiliency of our brands."

158. The statements in ¶157 were materially false and misleading and omitted material facts. While claiming that MBI was "recalibrating wholesale production to match retail demand," Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, Defendants understood MBI's dealers already possessed more inventory than they needed or wanted, and thus that MBI was not recalibrating to match wholesale supply with retail demand. Additionally, Defendants were made aware through MBI's Marketing Department that MBI boat registrations had decreased significantly.

### January 30, 2024 2Q2024 Form 10-Q

159. Also on January 30, 2024, after market close, the Company filed its 2Q 2024 Form 10-Q. The Form 10-Q stated the following:

> **We sell our boats through a dealer network that we believe is the strongest in the recreational powerboat category…** Our dealer base is an important part of our consumers' experience, our marketing efforts and our brands. **We devote significant time and resources to find, develop and improve the performance of our dealers and believe our dealer network gives us a distinct competitive advantage.**
>
> * * *
>
> We believe our strong brands, new product pipeline, **strong dealer network** and ability to increase production will allow us to maintain, and potentially expand, our leading market position in performance sports boats.

160. The statements in ¶159 were materially false and misleading and omitted material facts. While claiming that MBI devotes a "significant time and resources to find, develop and improve the performance of our dealers[,]" Defendants were engaged in a scheme to pump one of

58

the Company's dealers with excess inventory in order to manipulate falling sales figures. As such, it was materially misleading for Defendants to claim that MBI makes a "significant" effort to improve the performance of its dealers while overloading one its largest dealers with excess inventory.

**_January 30, 2024 2Q2024 Earnings Call_**

161.    Also on January 30, 2024, after market close, the Company hosted an earnings call for investors concerning its financial results for the second quarter of fiscal year 2024. During the earnings call, Defendant Springer stated that "[o]ur customer segment that has remained strong i[s] the premium segment, cash buyers who are looking for the larger, [feature]-rich premium boat." Defendant Springer emphasized the Company was "**_highly focused on recalibrating to match wholesale production to retail demand_**" and added that MBI was "**_very, very committed to reducing channel inventories to lower levels[.]_**"

162.    More specifically, Defendant Springer stated the following:

> While the retail environment is compressed, the biggest factor contributing to a tough year-over-year comparison is the normalization of channel inventory. Over the last 2 fiscal years, we have been focused on rebuilding our channels from historically low levels brought on by lingering supply chain challenges and unprecedented demand during the pandemic. Today, these dynamics have shifted and the level setting is going on as the inventory channels have fully recovered. **_We are back to natural market dynamics and MBI is highly focused on recalibrating to match wholesale production to retail demand. We are very, very committed to reducing channel inventories to lower levels_** that set up the dealer and MBI brands to recover more quickly once retail begins growing again.

163.    Later during the earnings call, Defendant Springer asserted that the Company was "being very responsible with channel inventories, and that's what we're hearing [from] our dealers." When an analyst asked a question regarding whether the most recent MBI guidance was "conservative," Defendant Springer stated:

> I would tell you **_it's a conservative guide_**. We had -- as you can imagine, we've had a lot of discussion on it. There is not any upside baked into the back half of the

59

year for us. So that would be welcome certainly. ***But there's nothing to tell. We believe that this, as we say, is conservative*** in that if we see some positive tailwinds that it will be beneficial.

164.     Also during the earnings call, Defendant Springer responded to an analyst's question concerning slumping EBITDA margins in the quarter by stating:

> I mean if you look at what our goals are for the rest of this year, channel inventories have to come in line. ***And so we have taken production down more significantly than were probably anybody can have ascertained or are predicted. And we are going to get inventory levels [back] where they need to be to support our dealers.*** And honestly, I think dealers' appetite right now. I think they want it to be historic channel inventory. They would like to be at least for a little while, a little bit lower than general inventory historically.

165.     However, Defendant Springer would admit during the earnings call that "***channel inventories [were] higher than we, or our dealers would like to see[,]***" and more specifically that the Company's dealers possessed "***around 5 weeks too much on hand inventory[.]***"

166.     On this news, the price per share of the Company's common stock nearly 20% in one day day—or $9.47 per share—on unusually high volume, from a closing price of $51.03 per share on January 29, 2024 to close at $41.56 per share on January 30, 2024.

167.     Despite this partial emergence of the truth, Defendants continued to mislead investors regarding, among other things, the purportedly temporary nature of the Company's poor financial results. While assuaging investors' immediate fears, Defendants' scheme to pump inventory into Tommys in order to inflate revenue figures would soon come to the forefront. Under penalty of perjury, Borisch (Tommys president and owner) stated that three major MBI stakeholders told him personally in early 2024 that they were aware Defendant Springer was "***intentionally pumping Tommy's full of inventory***" to inflate revenue and that he "***would not turn the spigot off***" despite knowing Tommy's inventory limits, and as such Defendant Spring was "***not going to last***" [at the Company].

168. In confirmation of these statements, the Company issued an unexpected press release on February 20, 2024, stating that Defendant Springer would resign both as CEO and from the Board, effective May 17, 2024. The Company also filed a Form-8K detailing this change.

169. On this news, the price per share of the Company's common stock nearly 9% in one day day—or $4.33 per share—on unusually high volume, from a closing price of $47.48 per share on February 16, 2024 to close at $43.15 per share on February 20, 2024.

***March 5, 2024 Raymond James Institutional Investors Conference***

170. On March 5, 2024, Defendant Springer attended the Raymond James Institutional Investors Conference on behalf of the Company.

171. During the Conference, Defendant Springer discussed the Company's approach for monitoring the overall health of its dealer network. Defendant Springer stated:

> Wells Fargo is a key partner for us. We have monthly calls with them. We're talking about dealers that may be stressed or somewhat, but at the same time we're following that. We want to know what the dealer health is and we actually have a report card on that.

172. The statements in ¶167 and ¶¶170-171 were materially false and misleading and omitted material facts. While claiming that MBI was actively monitoring dealer health," Defendants were engaged in a scheme to pump one of the Company's dealers with excess inventory in order to manipulate falling sales figures. Further, on February 26, 2024, the inventory pumping scheme collapsed as Defendant Springer notified Tommy's that MBI would not be renewing any dealership agreements with them for the fiscal year of 2024. The following day, February 27, 2024, Tommy's entered into default pursuant to an agreement with M&T Bank, with debts in excess of $110 million on account of its coerced purchases from the Company. Further, on March 22, 2024, Defendant Springer stated in a letter to Mr. Borisch that the Company would be permanently terminating its partnership with Tommy's and refused to build or ship inventory

to Tommy's, pursuant to Tommy's default agreement. As such, it was materially misleading for Defendant Springer to state that MBI was actively interested in dealer health while a major MBI dealer went into default on account of Defendants' fraudulent scheme.

## THE TRUTH FULLY EMERGES

173. On April 10, 2024, Tommy's filed a complaint against the Company alleging several claims, including breach of obligation under dealership agreement, promissory estoppel, and intentional and negligent misrepresentations relating to the parties' commercial relationship. Specifically, the complaint alleged that MBI perpetrated "an elaborate scheme to over manufacture and pump nearly $100 million of its highest priced, highest margin, slow moving boat inventory into fifteen (15) Tommy's dealerships … in order to artificially inflate Malibu's sales performance, artificially claim increased market share in the industry and artificially inflate its stock value…" Subsequently on April 11, 2024, the Company filed a Form 8-K with the SEC acknowledging both the termination of its relationship with Tommy's and the lawsuit Tommy's filed against it.

174. On this news, the price per share of the Company's common stock fell $3.34 per share, or nearly 8%, on unusually high trading volume, from a closing price of $41.82 per share on April 11, 2024 to close at $38.48 per share on April 12, 2024.

175. On April 15, 2024, analyst Raymond James published a report downgrading the Company's evaluation. James stated that this downgrade was due "***to the loss of Tommy's Boats, one of MBUU's largest dealers.***" James also noted the significance of ". . . ***Tommy's inventory being absorbed into the dealer channel on MBUU's sales and margins, the implications of which we fear could extend into FY25.***" As such, James observed the likelihood that MBI would "feel the impact" and "share in the loss" of offloading inventory at steep enough discounts to move the unsold inventory.

62

176.    On this news, the price per share of the Company's common stock fell $2.34 per share, or nearly 6%, on unusually high trading volume, from a closing price of $38.48 per share on April 12, 2024 to close at $36.14 per share on April 15, 2024.

177.    The truth finally emerged on May 2, 2024, when the Company released its financial results for the third quarter of fiscal year 2024. The Company reported a 46% drop in new sales from the prior quarter and a 70% drop in Adjusted EBITDA. As such, the Company projected that consolidated net sales for the fiscal year of 2024 would be 40% lower than the previous year. Defendant Springer attributed these adjustments to "weakened retail environment characterized by lingering uncertainty and softened retail demand," as well as excess inventory. Defendant Springer stated that the Company needed to "***focus on channel inventory reductions through the remainder of fiscal year '24,*** by reducing boat production "***even further to reach our goals of continuing to optimize the channel inventory,***" and noted that product inventory was still four weeks too high.

178.    On this news, the price per share of the Company's common stock fell $1.27 per share, or nearly 4%, on unusually high trading volume, from a closing price of $33.06 per share on May 1, 2024 to close at $31.79 per share on May 2, 2024.

## REPURCHASES DURING THE RELEVANT PERIOD

179.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $19,549,406.42 to repurchase approximately 425,407 shares of its own common stock at artificially inflated prices between September 2023 and December 2023.

63

180.    According to the Form 10-Q the Company filed with the SEC on October 31, 2023 for the period ended September 30, 2023 ("1Q24 10-Q"), between September 1, 2023 and September 30, 2023, the Company purchased 199,276 shares of its common stock for approximately $9,619,053 at an average price of $48.27 per share.

181.    As the Company's stock was actually worth only $31.79 per share, the price at closing on May 2, 2024, the Company overpaid by approximately $3,284,068 for repurchases of its stock between September 1, 2023 and September 30, 2023.

182.    According to the Form 10-Q the Company filed with the SEC on January 30, 2024 for the period ended December 31, 2023 ("2Q24 10-Q"), between November 1, 2023 and November 8, 2023, the Company purchased 62,686 shares of its common stock for approximately $2,783,258 at an average price of $44.40 per share.

183.    As the Company's stock was actually worth only $31.79 per share, the price at closing on May 2, 2024, the Company overpaid by approximately $790,470 for repurchases of its stock between November 1, 2023 and November 8, 2023.

184.    According to the 2Q24 10-Q, between November 9, 2023 and November 30, 2023, the Company purchased 160,935 shares of its common stock for approximately $7,036,078 at an average price of $43.72 per share.

185.    As the Company's stock was actually worth only $31.79 per share, the price at closing on May 2, 2024, the Company overpaid by approximately $1,919,955 for repurchases of its stock between November 9, 2023 and November 30, 2023.

186.    According to the 2Q24 10-Q, between December 1, 2023 and December 31, 2023, the Company purchased 2,510 shares of its common stock for approximately $111,017 at an average price of $44.23 per share.

64

187.    As the Company's stock was actually worth only $31.79 per share, the price at closing on May 2, 2024, the Company overpaid by approximately $31,224 for repurchases of its stock between December 1, 2023 and December 31, 2023.

188.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $6,025,718.

## DAMAGES TO MBI

189.    As a direct and proximate result of the Individual Defendants' conduct, MBI has lost and will continue to lose and expend many millions of dollars.

190.    Such losses include over $6 million that the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

191.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy any judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

192.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on any misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

193.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

194.    Additionally,    these    expenditures    include,    but    are    not    limited    to,    unjust

compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

195.     As a direct and proximate result of the Individual Defendants' conduct, MBI has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

196.     Plaintiff brings this action derivatively and for the benefit of MBI to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of MBI, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act.

197.     MBI is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

198.     Plaintiff is, and has been at all relevant times, a shareholder of MBI. Plaintiff will adequately and fairly represent the interests of MBI in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

199.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

200.     A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following nine individuals: Defendants Buch,

66

Chhina, Connolly, Hooks, Lanigan, Murphy, Stokely, and Taylor (collectively, the "Director-Defendants"), and non-party Steven D. Menneto ("Menneto") (with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the nine Directors that were on the Board at the time of the filing of this complaint.

201.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact.

202.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted the Company to issue materially false and misleading statements. Specifically, the Director-Defendants caused MBI to issue false and misleading statements which were intended to make MBI appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

203.    Additional reasons that demand on Defendant Buch is futile follow. Defendant Buch has served as a Company director since February 2014. He also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting

and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Buch signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting, *inter alia*, to reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Buch breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

204. Additional reasons that demand on Defendant Chhina is futile follow. Defendant Chhina has served as a Company director since February 2014. He also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Chhina signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Connolly, Lanigan, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Chhina breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

205. Additional reasons that demand on Defendant Connolly is futile follow. Defendant Connolly has served as a Company director since February 2014. He also serves as Chair of the

Nominating and Governance Committee and as a member of the Compensation Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Connolly signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Lanigan, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Connolly breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

206. Additional reasons that demand on Defendant Hooks is futile follow. Defendant Hooks has served as a Company director since February 2014. He also serves as Chairman of the Board and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Hooks signedthe false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary

69

duties to the Company. For these reasons, Defendant Hooks breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

207. Additional reasons that demand on Defendant Lanigan is futile follow. Defendant Lanigan has served as a Company director since February 2014. He also serves as Chair of the Compensation Committee and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Lanigan signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Connolly, and himself to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Lanigan breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

208. Additional reasons that demand on Defendant Murphy is futile follow. Defendant Murphy has served as a Company director since February 2014. He also serves as a member of the Compensation Committee and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false

and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Murphy signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Murphy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

209. Additional reasons that demand on Defendant Stokely is futile follow. Defendant Stokely has served as a Company director since February 2014. He also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. As such, he has received and continues to receive lucrative compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duty to protect corporate assets. Furthermore, Defendant Stokely signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Stokely breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

210.     Additional reasons that demand on Defendant Taylor is futile follow. Defendant Taylor has served as a Company director since April 2023. She also serves as a member of the Audit Committee and as a member of the Nominating and Governance Committee. As such, she has received and continues to receive lucrative compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to engage in the Channel Stuffing Misconduct and to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duty to protect corporate assets. Furthermore, Defendant Taylor signed the false and misleading FY 23 10-K and solicited the false and misleading 2023 Proxy Statement, which led to shareholders voting to, *inter alia*, reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Taylor breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

211.     Additional reasons that demand on non-party Menneto is futile follow. Menneto is neither disinterested nor independent, and therefore, is incapable of considering demand because he, as the Company's CEO, is an employee of the Company, and thus derives substantially all of his income from his employment with MBI, thereby rendering him not independent. Moreover, the Company notes in its SEC filings that "Menneto, due to his employment as [MBI's] Chief Executive Officer, does not qualify as independent." As such, Menneto could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Menneto is therefore futile.

212.     Additional reasons that demand on the Board is futile follow.

213. Defendants Buch and Stokely served as members of the Audit Committee at all relevant times. Further, Defendant Chhina served as Chairman of the Audit Committee at all relevant times, and Defendant Taylor served as a member of the Audit Committee at all relevant times after April 2023. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period and in violation of the Audit Committee Charter, Defendants Chhina, Buch, Stokely, and Taylor engaged in or permitted the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately review and discuss the Company's Forms 10-K and Forms 10-Q; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Chhina, Buch, Stokely, and Taylor further breached their fiduciary duties, are not disinterested, and demand is excused as to them.

214. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to participate in the Channel Stuffing Misconduct and to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to maintain the accuracy of Company records; protect and ensure the efficient use of Company assets; comply with all applicable laws, rules, and regulations; and

73

properly report violations of the Code of Conduct. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

215.    MBI has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for MBI any part of the damages MBI suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

216.    The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

217.    The acts complained of herein constitute violations of fiduciary duties owed by MBI's officers and directors, and these acts are incapable of ratification.

218.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of MBI. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of MBI, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

219. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause MBI to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

220. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Violations of**
**Section 14(a) of the Exchange Act**

221. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

222. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

223.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

224.    Under the direction and watch of Defendants Springer, Buch, Chhina, Connolly, Hooks, Lanigan, Lewis, Murphy, Stokely, and Taylor, the 2023 Proxy Statement failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

225.    The 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) current wholesale and retail demand for MBI's products were far lower than reported; (2) as a result, an incongruity existed between inventory supply and product demand; (3) the Individual Defendants were engaging in the Channel Stuffing Misconduct; and (4) as a result of the Channel Stuffing Misconduct, major MBI dealers were in serious financial predicaments due to dramatically enlarged inventories. As a result of the foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

226. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2023 Proxy Statement, including, but not limited to, the election of the Company's directors.

227. As a result of the material misstatements and omissions contained in the 2023 Proxy Statement, Company shareholders voted, *inter alia*, to reelect Defendants Chhina, Connolly, and Lanigan to the Board, thereby allowing them to continue breaching their fiduciary duties to MBI.

228. The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2023 Proxy Statement.

229. Plaintiff, on behalf of MBI, has no adequate remedy at law.

### SECOND CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

230. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

231. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding MBI. Not only is MBI now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon MBI by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase thousands of its own shares at artificially inflated prices, damaging MBI.

232. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce

77

and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

233. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about MBI not misleading.

234. The Individual Defendants, as top executives, acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

235. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### THIRD CLAIM
**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

236. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237. The Individual Defendants, by virtue of their positions with MBI and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of MBI and each of its

78

officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause MBI to engage in the illegal conduct and practices complained of herein.

238.    Plaintiff, on behalf of MBI, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Breach of Fiduciary Duties**

239.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

240.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of MBI's business and affairs.

241.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

242.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of MBI.

243.    In breach of their fiduciary duties owed to MBI, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, inter alia, that: (1) current wholesale and retail demand for MBI's products were far lower than reported; (2) as a result, an incongruity existed between inventory supply and product demand; (3) the Individual Defendants were engaging in the Channel Stuffing Misconduct; and (4) as a result of the Channel Stuffing Misconduct, major MBI dealers were in serious financial predicaments due to dramatically enlarged inventories. As a result of the

79

foregoing, Defendants' statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

244.    In further breach of their fiduciary duties, the Individual Defendants engaged in and/or caused the Company to engage in the Channel Stuffing Misconduct and failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

245.    Also in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

246.    In yet further breach of their fiduciary duties, during the Relevant Period, two of the Individual Defendants engaged in lucrative insider sales while the Company's stock price was artificially inflated before the fraud was exposed, netting combined total proceeds of approximately $1,525,510.

247.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of MBI's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

248.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

80

249.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, MBI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

250.     Plaintiff, on behalf of MBI, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

251.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

252.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, MBI.

253.     The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from MBI that was tied to the performance or artificially inflated valuation of MBI, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

254.     Plaintiff, as a shareholder and a representative of MBI, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

255.     Plaintiff, on behalf of MBI, has no adequate remedy at law.

## SIXTH CLAIM

**Against the Individual Defendants for Abuse of Control**

256.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

257.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence MBI, for which they are legally responsible.

258.    As a direct and proximate result of the Individual Defendants' abuse of control, MBI has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, MBI has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

259.    Plaintiff, on behalf of MBI, has no adequate remedy at law.

## SEVENTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

260.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MBI in a manner consistent with the operations of a publicly held corporation.

262.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, MBI has sustained and will continue to sustain significant damages.

263.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

82

264.    Plaintiff, on behalf of MBI, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

265.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

266.    The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

267.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

268.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused MBI to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, to be subject to investigations and civil inquiries, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

269.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

270.    Plaintiff, on behalf of MBI, has no adequate remedy at law.

## NINTH CLAIM
### Against Defendants Springer, Beckman, Black, and Wilson for Contribution Under Sections 10(b) and 21D of the Exchange Act

271.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

272.    MBI and Defendants Springer, Beckman, Black, and Wilson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws

for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Springer's, Beckman's, Black's, and Wilson's willful and/or reckless violations of their obligations as officers and/or directors of MBI.

273.    Defendants Springer, Beckman, Black, and Wilson, because of their positions of control and authority as officers and/or directors of MBI, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of MBI, including the wrongful acts complained of herein and in the Securities Class Action.

274.    Accordingly, Defendants Springer, Beckman, Black, and Wilson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

275.    As such, MBI is entitled to receive all appropriate contribution or indemnification from Defendants Springer, Beckman, Black, and Wilson.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of MBI, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to MBI;

84

(c)    Determining and awarding to MBI the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing MBI and the Individual Defendants to take all necessary actions to reform and improve MBI's corporate governance and internal procedures to comply with applicable laws and to protect MBI and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of MBI to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)    Awarding MBI restitution from the Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: May 16, 2025

Respectfully submitted,

*s/Paul Kent Bramlett*
Paul Kent Bramlett (TN #7387)(MS#4291)
Robert Preston Bramlett (TN #25895)
**BRAMLETT LAW OFFICES**
P.O. Box 150734
Nashville, TN 37215
Tel: (615) 248-2828
Fax: (866) 816-4116
pknashlaw@aol.com
robert@BramlettLawOffices.com

*Counsel for Plaintiff*

**OF COUNSEL:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Docusign Envelope ID: 027F3972-21DB-40E4-AD7C-ACD20247EAB4

## **VERIFICATION**

I, Meagan Green, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative and Direct Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 14__ day of May, 2025.

_____

Meagan Green